# ERNEST JATO MUTYAMBIZI *v.* STATE OF MARYLAND

[No. 1335, September Term, 1975.]

*Decided September 21, 1976.*

The cause was argued before J. Dudley Digges, Associate

Judge of the Court of Appeals, *SOLOMON LISS, Associate Judge of the Eighth Judicial Circuit, and CHARLES E. EDMONDSON, Associate Judge of the First Judicial Circuit, all specially assigned.

*Geraldine Kenney Sweeney, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*John A. Austin, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Richard P. Arnold, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

This tragedy had its beginnings in South Africa and its denouement in Prince George's County. The appellant, Ernest Jato Mutyambizi, was a native of Rhodesia and his wife, Gloria, a native of South Africa. They were married in 1963 and in 1965 came to the United States, where the husband studied at Lincoln University in Pennsylvania. In 1967, the seas of matrimony became stormy, and appellant and his wife separated. During the separation Gloria bore a child fathered by another man. About a year and a half after the original separation, the couple reconciled. In the interim, appellant had been awarded his master's degree from Georgetown University; but because of his inability to finance his further studies in the U.S., he left his wife and went to England to work on his doctoral dissertation. He returned to Washington a year later and resumed cohabitation with his wife and four children, three being his and the fourth the result of his wife's temporary liaison during the separation. The marital relationship was far from peaceful; and in January, 1972, the wife filed a bill for divorce and by court order appellant was evicted from their

dwelling. During this separation the wife lived with another man. In August of 1973, the couple again reconciled and remained together until October of 1974 when the wife filed a supplemental bill of complaint. On December 18, 1974, counsel for both parties were notified that a hearing on the wife's supplemental bill was scheduled for February 27, 1975. During the several separations, the children had lived on some occasions with their mother and on others with the appellant.

On December 22, 1974, the children were with the father in Lanham when the mother came to the appellant's house and told the children to pack. Sharon, the eldest, began to follow her mother's instructions and heard her parents arguing in the living room. She observed that her father had a gun and heard her mother say, "You keep saying you are going to shoot somebody and you never kill anybody.... If you're going to kill someone, go ahead." Her father replied that he didn't want to kill the mother. A few minutes later Mrs. Mutyambizi walked down the steps toward the front door and the father pulled the gun out of his pocket and shot her. The appellant then took the children to get some ice cream and later put them to bed, telling them he was going to take their mother to the hospital. Delores Gatlin, a friend of the mother, testified that she went to the Mutyambizi home the next day and discovered the body of Mrs. Mutyambizi on the bed covered with a coat. After determining there was no pulse, she left the premises and notified the police, who arrested the appellant at the premises and removed a .22 caliber pistol from his clothing.

Appellant's version of the events was substantially different from that adduced by the State: he contended that on December 22, 1974, his wife called and requested that he drive her to work, which he did, and that he later picked her up at work and drove her to his home in Lanham. He had been taking pain medication for an injury to his arm, and his wife gave him two pills to relieve a headache. Shortly thereafter he had a shot of whiskey. An argument ensued, during the course of which she suggested they come back together again for the sake of the children, but he refused.

He was on the sofa trying to sleep when his wife said, "How romantic it would be to die together." He saw his wife with a gun in her hand which he recognized as one usually kept on the top shelf of the bookcase in the living room. When she refused to put it back, he took it away from her and kept it with him. He then returned to the sofa and started "feeling funny as if I were floating." He heard a sound "as if there was lightning in the house, lightning and thunder" and "the next thing I knew I was in jail and it was Christmas morning."

A plea of insanity at the time of the commission of the offense was made, and the issue of sanity was submitted to the jury which found that the appellant was sane at the time of the commission of the offense.[1] No issue is raised on appeal challenging the jury's finding of sanity. The jury returned verdicts of guilty of second degree murder and guilty of the use of a handgun in the commission of a crime of violence. It is from the judgments entered upon these findings that this appeal was timely noted.

Appellant contends that the trial court erred in its rulings on the admissibility of evidence on three occasions, and that in each instance, the error amounted to reversible error. The first occasion was when Sharon Mutyambizi was called as a witness: she testified in direct testimony that as her mother walked down the steps toward the front door her father pulled a gun out of his pocket and shot her. When appellant took the stand in his own defense, he testified on direct examination that he had no recollection of his actions at the time the events were alleged to have occurred. During the course of his direct examination, counsel asked him, "Earlier yesterday, your daughter, Sharon, testified that she saw you

---

1. There was extensive expert testimony adduced at trial on the issue of insanity at the time of the offense. Briefly stated, appellant was evaluated at Clifton T. Perkins Hospital. Each of the five psychiatrists present at the staff conference felt that appellant was suffering from a mental disorder at the time of the offense, but the diagnoses differed: "hysterical neurosis with disassociative reaction"; "situation anxiety"; "anxiety neurosis with paranoid trends". Three of the psychiatrists were of the opinion that the mental disorder did not prevent Appellant from realizing the criminality of his behavior or from conforming his conduct; one psychiatrist felt that it did; the other expressed no opinion on the latter issue.

with a gun in the living room. Do you recall her saying that?" He answered, "I don't recall, but if she said [that] I do believe her."

The prosecutor, in cross-examination, without objection, was permitted to question the defendant concerning the testimony given by his daughter, Sharon, as follows:

"Q. Mr. Mutyambizi, you stated that if your daughter testified that she saw you with a gun you would believe her, is that correct?

A. I didn't say that, no.

Q. I see. Well, did you hear your daughter testify that she saw you with a gun?

A. Yes, I have heard my daughter testify to that.

Q. Were you not asked by your attorney whether or not that was true and your response was if she said it I believe her?

A. Probably, I did.

Q. You also — do you also believe her — do you recall her also testifying that your wife turned away from you, you had the gun, you drew the gun out of your pocket and pointed it in a downward position as she was walking down the steps and fired the gun at her? Do you remember her testimony to that effect?

A. I remember her testimony to that effect.

Q. Do you also believe that?

A. Not entirely.

Q. What part of it do you believe?

A. Excuse me, do you want me to explain?

Q. Yes.

A. There is a difference here with people picking out information from a person and a person speaking on her own.

Q. Yes. What information do you believe? What part did she testify to that you believe?

MR. KEANE: Objection.

60

THE COURT: Overruled. You may answer
that, if you can.

At this juncture, the prosecutor attempted to elicit from the appellant those portions of Sharon's testimony he believed and those which he disbelieved. Timely objection as to this line of questioning was offered and overruled. Appellant contends that the trial court erred in permitting this cross-examination.

Judge Robert C. Murphy, formerly of this Court, now Chief Judge of the Court of Appeals of Maryland, stated the definitive standards for cross-examination in *DeLilly v. State*, 11 Md. App. 676, 276 A. 2d 417 (1971). He said:

"We are, of course, mindful of the general rule so frequently cited that the allowance or disallowance of questions on cross-examination is normally left to the sound discretion of the trial judge. But where the limitations imposed by the Court upon cross-examination are such as plainly inhibit the ability of the accused to obtain a fair trial the general rule is manifestly inapplicable. *Shupe v. State*, 238 Md. 307. The real object of cross-examination is 'to elicit all the facts of any observation or transaction which has not been fully explained'. *Williams v. Graff*, 194 Md. 516, and cases cited at p. 523. That a witness may be cross-examined on such matters and facts as are likely to affect his credibility, test his memory or knowledge or the like, is a fundamental concept in our system of jurisprudence. *Kantor v. Ash*, 215 Md. 285; *Bryant v. State*, 4 Md. App. 572. And cross-examination to impeach, diminish, or impair the credit of a witness is not confined to matters brought out on direct examination; it may include collateral matters not embraced in the direct examination to test credibility and veracity, it being proper to allow any question which reasonably tends to explain, contradict, or discredit any testimony given by the witness in chief, or

which tends to test his accuracy, memory, veracity, character, or credibility." 11 Md. App. 676, at p. 681.

The Appellant's defense rested primarily on his statement that he had no recollection of the events which led to his wife's death. It was his counsel who raised the issue as to the daughter's testimony. During appellant's cross-examination, no objection was offered until he attempted to equivocate by suggesting that he believed some of his daughter's testimony and disbelieved other portions. The prosecutor then attempted, over objection, to have him specifically indicate which portions he believed and which he disbelieved. Whether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper, either on direct or cross-examination.

The second error alleged by appellant is the trial court's overruling of defense counsel's objections to questions concerning unauthenticated telephone calls allegedly received by Edward J. Skeens from the appellant. Skeens, who was representing Mrs. Mutyambizi in the domestic squabble between the parties, had made a call in January of 1972 to the appellant; and while the subject matter of that call was disputed, the receipt of it was conceded by appellant. The calls which were objected to were those allegedly made by the appellant to Skeens. It was the admission of testimony as to these two calls that counsel for the defense contends was reversible error. Appellant's contention is that no proper foundation was laid for the admissibility of this evidence.

The general rule of evidence is that in order to render testimony of a telephone conversation admissible, some *preliminary* testimony, either direct or circumstantial, must be presented to establish the identity of the other person to the conversation. *Basoff v. State,* 208 Md. 643, 649, 119 A. 2d 917, 920 (1956); *White v. State,* 204 Md. 442, 446, 104 A. 2d 810; 1 Wharton Criminal Evidence, 11th Ed., Sec. 379.

The mere fact that the caller purported to be the appellant

is not sufficient to make the telephone conversation admissible. 7 J. Wigmore, Evidence, Sec. 2155 (1)b (3rd Ed.) is authority for the proposition that a call may be authenticated from "sundry circumstances". This test was applied by this Court in *Ford v. State,* 11 Md. App. 654, 657, 276 A. 2d 423, 424 (1971). In that case, a telephone conversation was admitted where the facts showed that the parties had talked about mutual acquaintances and had discussed the purchase and quality of illicit drugs, the latter being the subject matter of the prosecution. Applying similar standards in the instant matter, the facts show that the caller identified himself as Mr. Mutyambizi; said that he had just been served with a copy of the supplemental bill of complaint; stated that his wife had kidnapped his son and that he had made a complaint in Seat Pleasant; and gave Skeens the case number of the pending divorce matter. The intimate knowledge which was displayed concerning the marital situation and the pending divorce action is in our opinion sufficient "sundry circumstances" as to amount to an authentication of the caller. Appellant denied making the calls, but this was a matter for determination by the trier of the facts. We find no error in the court's overruling defense objections to the admissibility of the evidence of the phone conversation.

The third and final objection to the trial court's rulings on the evidence concerns the court's refusal to sustain defense counsel's objections to alleged hearsay evidence given by Attorney Skeens. Skeens in direct testimony had related the progress of the divorce proceedings between the parties. At the very end of that direct testimony, the following occurred:

"Q. Do you have personal knowledge of anything which occurred on May — approximately May the 12th, 1974 with regard to the parties around Mother's Day?

A. I have personal knowledge from what Mrs. Mutyambizi told me.

Q. When did you see her? Was it after the 12th of May, 1974?

A. Yes.

Q. How soon after was it?

A. This was in connection with the filing of the supplemental bill that incident and the other incident."

On redirect examination, the prosecutor asked Skeens what "extraordinary facts" had prompted him to talk to the appellant when he had called Skeens twice on October 31, 1974. The testimony was as follows:

"Mr. Arnold: Mr. Skeens, you stated on cross-examination that you determined it advisable to talk to the Defendant when he called you twice on October 31, 1974 because of the extraordinary facts in this case, is that correct?

A. Correct.

Q. Would you tell us what those facts might be?

Mr. Keane: Objection. It has been asked and answered on direct and on cross.

The Court: I'm not so sure it has. Overrule your objection, you may answer the question.

The Witness: The extraordinary facts in this case at that time were incidents that occurred around holidays all the time. May 12th, Mother's Day, Thanksgiving Day, 1974, Christmas Eve, 1973, and from the extraordinary facts, that I considered extraordinary in a domestic matter was that this man on Christmas Eve, 1973, held his wife at gunpoint, twirled the barrel —

Mr. Keane: Objection.

The Court: Overruled.

The Witness: — and stated that he was going to kill her and kill himself. He stuck the gun, twirled the barrel once playing Russian roulette. He had one slug in the gun and was spinning it around, pointed it to his chest and pulled the trigger and it clicked. On another incident I believe this was around Mother's Day of '73 after he had assaulted Mrs.

Mutyambizi, she had to go to the hospital for X-Rays and treatment, he fired the gun in the house, he bolted the door. He put a chair up against the door and then he fired the gun that he had in the house at that time. He would load the gun in the presence of his wife and tell her he was going to kill her, showing her the bullet saying I am going to put this in the gun and kill her with it and, of course, terrifying her. She was terrified of him all the time. I have seen her talk to him. It was a case, I knew from my experience —

Mr. Keane: Objection.

The Court: Sustained.

Mr. Arnold: What was there on Thanksgiving — what extraordinary facts occurred around Thanksgiving of 1974?

Mr. Keane: Objection.

The Court: Overruled.

The Witness: in 1974 —

The Court: You opened the door, Mr. Keane. Overruled.

Mr. Keane: I object to it being called 'facts'.

The Court: Overruled, sir. You may continue.

The Witness: On Thanksgiving, 1974, this is now — the case is pending in court, the supplemental bill had been filed and the children were with Mr. Mutyambizi. We had already discussed the matter of getting the custody resolved and I believe the custody at that time was very close to being resolved. The mother went over to see the children on that occasion and it appeared that everything was working smoothly. Mr. Marqualdt had come into the case, I believe on December 11th. Mr. Mutyambizi filed a paper in the case December 11th stating she could have custody of the children back. So even back then, on Thanksgiving Day it seemed that everything was working out fine and Mr. Mutyambizi got his wife over to the house and held

her at gunpoint the entire night until five-thirty in the morning and insisted that she have sex with him and when she refused he raped her[2] under gunpoint and then released her about seven or eight o'clock the following morning. She came to my office that next morning. I observed the condition she was in at that time. That was the —

Mr. Arnold: What was her condition at that time?

Mr. Skeens: Her eyes were bloodshot and she was very upset and I had instructed her to again go down to the State's Attorney's office for a warrant, that there was nothing I could do further in the case."

Appellant contends that the testimony of Skeens permitted by the trial court as to those events occurring between appellant and his wife was clearly hearsay. We agree. Hearsay evidence has been defined as "testimony in court of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." McCormick, Evidence, Sec. 246 (2d Ed. 1972); *Johnson v. State,* 23 Md. App. 131, 326 A. 2d 38 (1974); *Wilkins v. State,* 11 Md. App. 113, 273 A. 2d 236 (1971); *Quiles v. State,* 4 Md. App. 354, 243 A. 2d 661 (1968).

The traditional objection to hearsay evidence was stated by the renowned Chancellor Kent:

"A person who relates a hearsay is not obliged to enter into any particulars, to answer any questions, to solve any difficulties, to reconcile any contradictions, to explain any obscurities, to remove any ambiguities; he entrenches himself in the simple assertion that he was told so, and leaves the burden entirely on his dead or absent author." McCormick, *supra,* at 583.

Our examination of the transcript convinces us that the testimony of Mr. Skeens as to the aforesaid incidents was

---

2. We do not rule on the question whether a husband can in fact rape his wife.

based on what he had been told by Mrs. Mutyambizi. The general rule in the absence of a statute or rules of evidence to the contrary is that "a declaration which is objectionable as hearsay is not rendered competent by the fact that the declarant has died since the declaration was made. . . ." 31A, *C.J.S.* Evidence, Sec. 205 (1964); see also: *Lenz v. So. Pac. Co.*, 493 F. 2d 471 (5th Cir. 1974).

We find the admission of Skeens' hearsay testimony was erroneous. We must therefore proceed to determine whether the error was prejudicial or harmless. 2 Wharton, Criminal Evidence, Sec. 272, at 21 (13th ed. 1972), succinctly states the effect of erroneous admission of hearsay evidence:

"Where hearsay evidence has been improperly admitted over the objection of the adverse party, the error will require a reversal if the evidence relates to a material issue or is prejudicial to such adverse party. If the hearsay evidence is neither material nor prejudicial, the error will be ignored, provided that the conviction is amply supported by other competent evidence. Thus, the admission of hearsay evidence will not constitute reversible error where it is merely cumulative." *Johnson v. State*, 23 Md. App. 131, 136, 326 A. 2d 38, 42 (1974).

Our review of the transcript and the records convinces us that it was prejudicial error to admit the hearsay testimony in this case. Skeens' testimony as to the Mother's Day and Thanksgiving Day incidents were highly inflammatory. His conclusions, based on the information he received from the decedent, that the appellant had assaulted and raped his wife, were clearly prejudicial. All reasonable doubts as to the effect of erroneously admitted evidence upon the jury's determination of guilt must be resolved in favor of the objecting party. *Johnson v. State, supra*, pp. 138, 139; *Gilchrist v. State*, 2 Md. App. 635, 236 A. 2d 299 (1967); *Younie v. State*, 272 Md. 233, 322 A. 2d 211 (1974).

The Court of Appeals has adopted the following test to determine whether an error is harmless or prejudicial:

"We conclude that when an appellant, in a criminal

case, established error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated." *Dorsey v. State,* 276 Md. 638, 659, 350 A. 2d 665, 678.

Upon our review of the record, we find that it does not meet this test. We find that there was prejudicial error and therefore reverse the appellant's convictions and remand for a new trial.

There is one other contention raised by appellant, but because of our holding above, it is not necessary for us to reach this issue. Appellant contends that in the light of the *Mullaney* and *Evans* decisions,[3] the trial judge committed plain error in his instructions to the jury as to the burden of proof. At the time of the trial of this case, *Evans* and other progeny of *Mullaney* were pending before the Court of Appeals of Maryland. That Court has now decided the series of cases arising out of the *Mullaney* decision.[4] This Court has decided *Squire v. State,* 32 Md. App. 307, 360 A. 2d 443 (1976), in which we said that a claim of plain error, Maryland Rule 756 g, was not available when the trial was held after 9 June 1975, the date of the *Mullaney* decision. These decisions should provide adequate guidelines to assist the trial court in its instructions to the jury, in the event of a retrial of this matter.

> *Judgments reversed.*
> *Case remanded for a new trial.*
> *Costs to be paid by Prince George's County.*

---

**3.** *Mullaney v. Wilbur,* 421 U. S. 684, 95 S. Ct. 1881, 44 L.Ed.2d 508 (1975); *Evans v. State,* 28 Md. App. 640, 349 A. 2d 300 (1975).

**4.** *State v. Evans,* 278 Md. 197, 362 A. 2d 629 (1976); *State v. Garland,* 278 Md. 212, 362 A. 2d 638 (1976); *Dorsey v. State,* 278 Md. 221, 362 A. 2d 642 (1976).