556 A.2d 1162

**Keith N. LEVITT**

v.

**Holly A. LEVITT.**

**No. 1274, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

May 2, 1989.

Certiorari Denied July 21, 1989.

Gary H. Simpson (Alvin M. Ehrlich and Simpson & Ehrlich, P.A., on the brief), Bethesda, for appellant.

Ralph E. Hall, Jr., Rockville, for appellee.

Argued before BISHOP, ROSALYN B. BELL and POLLITT, JJ.

ROSALYN B. BELL, Judge.

Five-year-old Chad needs (1) parents who put his needs ahead of their own. He also needs (2) a lawyer. He has none of these. We are not able to provide him with the first, but we will furnish him the second.

A Master of the Circuit Court for Montgomery County recommended that the custody of Chad be changed from a form of joint custody to the sole custody of the father. The Chancellor disagreed and continued the custody as it had existed, but did increase the visitation of the father. We hold the record inadequate and remand for further proceedings.

In 1985, after a short and intensely stormy marriage, Keith and Holly Levitt sought a divorce. While a *pendente lite* hearing was in progress, they entered into a separation agreement in which they settled the custody of their then two-year-old son, Chad. They agreed to child support of $250 per month and alimony of $1,750 for 200 months. It is difficult to put a name to the type of custody arrangement the parties devised; counsel refer to it as serial or joint custody. Regardless of the name, the parties agreed that Chad would live with his mother. He was to be with his father on alternate weekends from Friday afternoon to

Sunday at 7:00 p.m., Wednesday evenings until 9:00 p.m., and two weeks a year. The paternal grandparents were also to have the child one week per year. The parties would share all holidays, except the father was entitled to all Jewish holidays.[1] The divorce was granted on October 30, 1986. In retrospect, this agreement seems to have served primarily to establish a new area in which the parties could continue their on-going controversies. Four separate Rules to Show Cause came before the Master, seeking various forms of relief, including modifications of custody on both sides and charges of contempt. Keith Levitt filed a Motion for a Change of Custody in September of 1987, alleging that Holly Levitt had violated a prior consent order which had been issued to remedy many of the visitation problems that had arisen since the divorce. Specifically, Keith alleged that Holly had failed to maintain a telephone answering machine[2] and made harassing telephone calls to Keith at the hospital where he worked as an anesthesiologist. Keith alleged that Holly had interfered with visitation by sometimes refusing to let Chad go with him on regularly scheduled visiting days. His application for change of custody also alleged that Holly refused to transport Chad either to or from Keith's place of residence. Hearings were held before the Master,[3] who found that it was not in Chad's best interests to remain with his mother. The Master also found that joint custody was not appropriate.

The Master recommended that Keith be awarded custody of Chad, with reasonable rights of visitation reserved to his mother and that Keith pay to Holly as attorney's fees the

---

1. The mother is not Jewish; the father is.

2. The consent order specified that Holly was to maintain a telephone answering machine at the apartment where she and Chad lived. This was ordered to ease communications between Holly and Keith in regard to visitation times.

3. Hearings were held on May 4, 5, 10 and 17, 1988. There were numerous other "show cause" orders, which are not relevant to the instant appeal except to show that communications between Holly and Keith were at a low ebb.

sum of $6,000 plus $1,368.85 as deposition costs plus $60 for private process server's fees. The Master denied Holly's request that she be allowed to keep custody of Chad and move to Florida where her family resided. Holly had also requested that the Master modify the consent agreement to provide dates and certain times, and that Keith be required to increase child support, visitation and alimony; the Master denied the relief requested by Holly.

Exceptions were filed and granted at a hearing at which no added testimony was taken. The Chancellor ordered:

"that the child shall reside with the Defendant during the school year and during that time he will visit the father on the first, second and third weekends of each month from 5:00 p.m. Friday to 7:00 p.m. on Sunday; and it is further

"ORDERED that the child shall reside with the father during summer vacation time and that during that time he will visit with the mother on the first, second and third weekends of each month from 5:00 p.m. Friday to 7:00 p.m. on Sunday...."

He further specified whose responsibility it was to pick up and deliver the child to the other parent, a specific holiday and birthday visitation including specific dates and hours, and concluded by ordering that Chad have uninhibited telephone access to each parent.

### —Change of Custody—

We are dealing here not with an original award of custody, but with a change of custody. They are quite different situations. They should be different, recognizing the importance of the child's need for continuity. Basically, if a child is doing well in the custodial environment, the custody will not ordinarily be changed.

In *Sartoph v. Sartoph*, 31 Md.App. 58, 66–67, 354 A.2d 467, *cert. denied*, 278 Md. 732 (1976), Judge Davidson opined for this Court:

"The custody of children should not be disturbed unless there is some strong reason affecting the welfare of the

child. To justify a change in custody, *a change in conditions must have occurred which affects the welfare of the child and not of the parents.* The reason for this rule is that the stability provided by the continuation of a successful relationship with a parent who has been in day to day contact with a child generally far outweighs any alleged advantage which might accrue to the child as a result of a custodial change. In short, when all goes well with children, stability, not change, is in their best interests." (Footnotes omitted.) (Emphasis added.)

In *Jordan v. Jordan,* 50 Md.App. 437, 443, 439 A.2d 26, *cert. denied,* 293 Md. 332 (1982), after quoting the above passage with approval, this Court said:

"The burden is on the appellant, who affirmatively seeks action by the chancellor in changing the custody of the minor child, to show why the court should take that action, and, if he fails to meet that burden, the action should not be taken." (Citation omitted.)

—Deference to the Master's Fact Finding—

Deference will be accorded to the facts as found by the Master, but this only applies to "first-level" facts. First-level facts are those that answer the What?, Where? and How? questions. Deference is not accorded to "second-level" facts or to recommendations. Second-level facts are ultimate conclusions drawn from the first-level facts. *See In re Danielle,* 78 Md.App. 41, 60–61, 552 A.2d 570 (1989). Second-level facts are conclusions and inferences drawn from first-level facts. A first-level fact would be that one or both parents used drugs. A second-level fact would be that that use did or did not affect Chad. A recommendation would be a change or lack of change of custody.

As Judge Moylan opined for this Court in *Wenger v. Wenger,* 42 Md.App. 596, 607, 402 A.2d 94 (1979):

"A chancellor may defer to the master on such first-level facts as that a husband makes $50,000 a year; the yearly orthodontia bill is $1500; the rent is $300 a month; the bank account of thus and so is thus and so. On the other

hand, such second-level, conclusory 'facts' as the wife's ultimate need or the husband's ultimate ability to pay are dispositional in nature and are the ultimate province of the chancellor."

■ We contrast the proper function of the Master with that of the Chancellor. The Master's primary responsibility is to develop the first-level facts. "In the interest of conserving valuable judicial resources, much laborious and time-consuming fact-finding has traditionally been carried on in the equity courts by masters (including auditors, referees, commissioners and examiners.)" *Wenger*, 42 Md. App. at 603–04, 402 A.2d 94. In order properly to find first-level facts, the Master, of course, is required to assess the credibility of the witnesses who testify. After establishing the factual record, the Master may then draw conclusions from the first-level facts and use these conclusions to make recommendations, which the Chancellor is free to disregard. It is the Chancellor's responsibility, not the Master's, to determine finally the parties' rights. Simply put, the Master is a ministerial and not a judicial officer. *Wenger*, 42 Md.App. at 602, 402 A.2d 94.

It is these first-level facts found by the Master which form the base on which the Chancellor makes his or her judicial determination. The Chancellor may choose to rely exclusively on the factual report of the Master and should defer to the fact-finding of the Master where that fact-finding is supported by credible evidence. If the Chancellor finds the Master's factual base inadequate, the Chancellor may remand to the Master or the Chancellor may conduct a *de novo* hearing, again so that a sound factual base exists for the ultimate determination.[4] We turn then to the instant case.

---

4. The Chancellor may also, if he or she wishes, proceed without remand or *de novo* hearing by reviewing the testimony and other evidence. He or she may then revamp the factual findings to reflect the credible evidence. The Chancellor, in a situation where the evidence depends upon the credibility of contradictory witnesses, can

■ To reverse the Chancellor, we must conclude that the Master's first-level fact finding could lead to only one conclusion—namely, that these facts establish a change of circumstances affecting the welfare of the child which necessitate a change of custody. We do not so conclude. Nor do we know why the Chancellor recommended such a diametrically opposite disposition from that recommended by the Master. Without those reasons or some additional evidence on the record, we are at a loss to review the Chancellor's decision.

In his Report and Recommendations, the Master made the following "findings of fact":

"1.  That it is not in the best interests of this minor child that he remain in the home of the [mother] acting as the custodial parent.

"2.  That joint custody is not appropriate in this case.

"3.  That the attitude of the [mother] towards the child and the [father] deprive the child of the necessary guidelines to develop in a normal manner.

"4.  That the [mother] does not want to live in this area.

"5.  That the [mother] has no immediate family in this area.

"6.  That the [father's] family is in this area.

"7.  That the [father's] family is close-knit and successful.

"8.  That the custody of the child must be changed to the [father].

"9.  That visitation with the [mother] cannot be specific at this time.

"10.  That the [father] should be required to contribute to the [mother's] attorney's fees and costs.

---

neither make the original finding of credibility nor ignore the credibility finding of the Master.

"11. That this is not the type of case where contempt for visitation should be used."

At first reading, this would seem to carry the day, but even on short reflection we note that most of the facts are conclusions and not first-level facts at all. Those that are facts, such as "[t]hat the [mother] has no immediate family in this area," and "[t]hat the [father's] family is in this area," are not changes in circumstances that necessarily affect the child.

The purported finding "[t]hat joint custody is not appropriate in this case" can scarcely be deemed a first-level fact finding, which is entitled to deference. We have carefully scrutinized the Master's Report to find any factual findings [5] to which deference should be applied which touch on the central issue, namely a change of conditions affecting Chad's welfare. The closest we come to a fact which is entitled to deference and is related to this central issue was one witness who described appellee "as angry and because of her anger the child suffers and is withdrawn." This witness had not seen the child for probably over two years. Moreover, in the interim, the parties had gone through a court proceeding, which resulted in no change of custody but in a consent order designed to help ease the communications between the parties.

Keith Levitt (appellant) testified that his son "desperately needs to be brought up with other children." The Master then went on to say, "A good friend of the [mother]'s, Diane Seller, was called as a witness and didn't add a great deal to the entire case, as was the case with Barbara De[v]ers." This finding of the Master is clearly erroneous. Seller spoke at length of the relationship of her son with

---

5. We have a torrent of conclusions, such as the appellee was "100% negative toward [appellant] and his family." "Both of the parties accuse the other of abusing the almost five year old in this case. They also charge each with harassment not only of each other but also of friends and family." While containing some semblance of first-level fact, these statements are not entitled to deference to the extent they are conclusions.

Chad, which included playing together three or four times a week. The two children attended the same preschool, and the children got along well and played "very well together." Devers stated that Holly Levitt (appellee) was a "fine mother" for Chad. If the Master had concluded the testimony was not to be believed, that is one thing; to say it adds nothing is clearly erroneous.

The Master also stated:

"All of the witnesses described an inability of the child to cope with other children and his mother has placed him in the middle of a dispute not only between his father and her but also between his father and [a girlfriend of his father's]."

The kindest thing that can be said for this is that it was inaccurate. Seller, as we already noted, clearly testified to the contrary.

The charges in this case were very serious and deserved more than a simple review. They involved evidence against the mother of alcohol and drug abuse, inappropriate sexual behavior, failure to provide Chad with a proper diet, failure to provide him with the outside stimulus of other children and more, which had allegedly resulted in Chad's confusion and delayed development. On the other hand, appellee accused the father of inappropriate sexual presentations to the child, drug abuse, lack of concern for Chad, harassment, refusal to permit Chad to go to any school save the ones he approved and more, which resulted in Chad's alleged confusion and contributed to his problems. No findings were made on basic facts relevant to these critical issues.

When, as here, a Chancellor is faced with a report that omits critical first-level facts, the Chancellor has only two courses to follow—to hear further evidence or remand to the Master to make the findings. This is basic to the relationship between Chancellor and Master—the two participants in the decision-making process.

██ The Chancellor stated that "based upon the Domestic Relations Master's report, and testimony taken this morning [he felt] the placement of the child [was] clearly erroneous." No testimony in fact was taken that morning. The placement of the child is not properly reviewed by the Chancellor on the clearly erroneous standard; the placement of the child must reflect the independent judgment of the Chancellor. Our review must then focus on whether the Chancellor had before him sufficient first-level facts supported by credible evidence upon which he could make these recommendations. We conclude the Chancellor did not have sufficient first-level facts to resolve the important issues which could affect this child. The Chancellor simply did not have sufficient factual findings upon which to make an informed judgment.

██ In light of all the circumstances, this five-year-old child needed some special consideration. One way for Chad to get it was through an attorney dedicated to looking out for Chad's interests, not those of his parents. Neither the Master nor the Chancellor spoke to Chad. While not essential in every case, perceptive conversation with him should have shed some light on how Chad felt about his parents and grandparents. If Chad had an attorney, this should have been presented. Neither side sought to offer a professional evaluation of this child. If Chad had an attorney, this might have been sought. Neither side sought to admit the testimony of Dr. Weintraub,[6] who saw both parents and Chad in August of 1987 in connection with the child's development. If Chad had an attorney, this possibility would have been explored. Neither side suggested that a home and school visit by an unbiased professional would shed some light on the issue. If Chad had an attorney, this would at least be considered.

---

6. It was not clear how many times Dr. Weintraub saw this family. Without knowing the full details, however, we suggest the procedure followed in *Nagle v. Hooks*, 296 Md. 123, 460 A.2d 49 (1983), be considered in this connection.

In short, on remand the Chancellor should appoint an attorney for Chad. We refer the Chancellor to Md. Fam.Law Code Ann. § 1–202 (1984):

"In an action in which custody, visitation rights, or the amount of support of a minor child is contested, the court may:

(1) appoint to represent the minor child counsel who may not represent any party to the action; and

(2) impose against either or both parents counsel fees."

*See also Stern v. Stern,* 58 Md.App. 280, 473 A.2d 56 (1984). The attorney should proceed expeditiously in the manner counsel deems to be in Chad's best interests. If additional evidence is to be presented, the Chancellor may remand to the Domestic Relations Master [7] or may hear the additional evidence. If it is remanded to the Master, detailed findings of first-level facts, conclusions flowing from these facts and recommendations are necessary. If on exception the Chancellor accepts the findings of fact, he or she should so state; if not, the basis therefore or any further fact-finding should be articulated in detail. The second-level facts as found should be examined and if the Chancellor differs from the Master, he or she should explain that difference. We direct that these matters be considered on an expedited basis.

We are most concerned that a five-year-old child has been the subject of litigation for over one-fourth of his life and has yet to see an end to it. We are also concerned that during the four days of testimony before the Master, the Master never spoke to the child, never heard from a truly objective witness and did not have the input of someone who would speak on behalf of the child. Since no other testimony was offered, the hearing before the Chancellor suffered from the same deficiency. This deficiency should

---

**7.** We are aware that the Master who heard this originally has since retired; hence, if remanded, the Master to whom it will be assigned will need to determine whether he or she needs to hear all or part of the testimony *de novo.*

be remedied by our direction that separate counsel be appointed for Chad.

We have difficulty gleaning from the record why it took from September 24, 1987 until May 4, 1988 to get a hearing, or why it took from May 17, 1988 until August 11, 1988 to get a hearing on the exceptions.[8]  Whatever the reasons may be, certainly in a case such as this there is need for quicker resolution.[9]

In view of the disparate financial position of the parties and the impact on the child if we further reduce the assets available to the now custodial household, we will exercise our discretion and award costs against appellant.  Appellee has filed a motion for attorney's fees in accordance with Rule 1–341.  As must be apparent from the preceding opinion, we conclude the appeal was filed neither in bad faith nor without substantial justification.

JUDGMENT VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

MOTION FOR ATTORNEY'S FEES UNDER RULE 1–341 DENIED.

COSTS TO BE PAID BY APPELLANT.

---

**8.** If the child is at risk, there was an alternative of seeking intervention under Md.Cts. & Jud.Proc.Code Ann. § 3–801(e) (1974, 1984 Repl.Vol., 1988 Cum.Supp.), as a Child in Need of Assistance.  While custody might or might not have been altered, if the situation warranted it, some services would have been available to protect the child.

**9.** If exceptions were routinely set for a hearing 45 days after the notice of intent, ample time would be allowed to file the Report, the exceptions and response, and the transcript.  While this would expedite all cases, it would appear to be most urgent where a claim is being made that a child is at risk.  Also, there are special provisions for an expedited appeal which could have been used in light of the seriousness of the allegations.  See Rule 8–207.  While this process would probably not have been feasible in this case, the case could have been put on an accelerated briefing and hearing schedule through appropriate motion.