589 A.2d 1303

**David S. SHUNK**

v.

**Vicki L. WALKER.**

**No. 1124, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 14, 1991.

Charles S. Rand and Donna H. Lapin, Rockville, for appellant.

No brief or appearance by appellee.

Submitted before MOYLAN, BLOOM and IRMA S. RAKER, (Specially Assigned), JJ.

BLOOM, Judge.

Appellant, David S. Shunk, was awarded custody of Joanna Shunk, the minor child of the parties, when he and appellee, Vicki L. Shunk (now Walker), were divorced in October 1988. On 8 May 1990, the Circuit Court for Howard County (Dudley, J.) passed an order awarding temporary custody of the child to appellee. Counsel for Mr. Shunk, who has had no contact with his client since 1 February 1990, filed this appeal on behalf of his client, and presents the following issues for our consideration:

I     Whether the chancellor erred in transferring custody to appellee, *pendente lite.*

II    Whether the chancellor erred in considering certain hearsay evidence regarding a change of circumstances.

III   Whether the chancellor erred in holding a show cause hearing on a petition for modification of custody without allowing appellant 15 days in which to file an answer to the petition.

Perceiving no reversible error, we shall affirm the judgment.

## Facts

The parties were divorced on 27 October 1988. The relevant portion of the divorce decree awarded custody of the parties' minor child, Joanna, who was six years of age at the time of the divorce, to appellant, and granted appellee the right of reasonable, supervised visitation.[1] In November 1989, appellant moved, with the child, to Melvindale, Michigan, for employment reasons.

Distressed by her inability to visit her daughter as a result of appellant's move to Michigan, appellee, on 15 December 1989, filed a motion to modify visitation, a motion to enforce visitation rights, a motion for contempt, and an emergency motion for increased visitation. In response to the emergency motion for increased visitation, and prior to receiving a response to the motion from appellant, the chancellor issued an order on 19 December 1989, in which he required appellant to produce the child for supervised visitation on 23 December 1989. The chancellor also issued an order requiring appellant to appear on 9 January 1990 for a show cause hearing concerning the motions for contempt and for modification of visitation. The 9 January 1990 hearing was subsequently postponed to 1 February 1990.

Both parties appeared at the 1 February 1990 hearing and agreed to a consent order that required appellant to have the child evaluated by a psychiatrist in the Detroit metropolitan area and to submit the report of the psychiatrist to the court within 60 days. Appellant was required to pay for all of the costs related to the evaluation, report, and any necessary therapy. The agreement also provided that the

---

1. The requirement that appellee's visitations be supervised stemmed from the chancellor's findings, at the time of the divorce, that appellee was the primary cause of the child's "extremely heightened sense of sexuality," false accusations of child abuse, and fantasies concerning satanic practices. Of particular significance to the chancellor's findings was appellee's insistence upon a "family bed," and her conduct in breast feeding the child "long past the time when it should have been discontinued." The chancellor also ordered appellee to undergo therapy for six to nine months in anticipation of normal visitation.

court would contact Dr. Charles Goshen of Columbia, Maryland, who had been evaluating appellee pursuant to the terms of the divorce decree, for the purpose of determining whether any present need existed to continue the supervision of appellee's visits with the child. Finally, the agreement provided that supervised visitations would continue, temporarily, and specified the dates of such visitations for the months of February, March, April, and May. The terms of the agreement were incorporated into an order of the court on 13 March 1990, at which time the hearing on all of the motions was postponed until 16 April 1990.

Thereafter, on 15 March 1990, appellee filed a petition to cite appellant for contempt, and a show cause order was issued on that date. Although an answer to the petition was filed by counsel for appellant, it was not signed or adopted by appellant. Further, appellant did not appear at the hearing on the show cause order, which was held on 22 March 1990, nor did he produce the child as directed by the court. Counsel for appellant informed the court that he had not been in personal contact with appellant since 1 February 1990, although he had mailed copies of all documents to appellant's last known address in Michigan. Appellee testified that she had not seen her daughter since 23 December 1989, as a result of appellant's failure to comply with the visitation dates specified in the court order. She also stated her belief that appellant had taken the child to Canada. At appellee's request, the hearing was continued until the 16 April 1990 motions hearing.

On 6 April 1990, appellee filed a petition to modify custody and for contempt. A show cause order was issued on that date directing appellant to appear at the 16 April 1990 hearing. Appellant did not respond to the petition.

Although counsel for appellant appeared at the 16 April 1990 hearing, appellant did not appear nor did he produce the child. During the hearing, Dr. Goshen testified that he knew of no reason why the visitations should be supervised or why appellee should not be awarded custody of the child. Appellee testified, over the objections of appellant's counsel,

that she had been informed by a relative of appellant that he and the child were living in Canada, that the principal of the school her child had been attending in Michigan had informed her during a telephone conversation that the child had been absent continuously since 16 February 1990, and that appellant had contacted the school by a letter post-marked Quebec, Canada. The only other witness at the hearing was Ms. Busy Graham, who had known appellee for five years and who had hired appellee to provide day care for her minor son. Ms. Graham testified that she believed that appellee was a fit and proper parent and posed no threat whatsoever to the child, Joanna.

On 8 May 1990, the chancellor issued a Memorandum and Order in which he found appellant guilty of contempt of court, but postponed the disposition of the contempt until such time as appellant appears before the court. The chancellor further found that appellant's contumacious conduct in failing to appear and produce the child prevented the court from effectively safeguarding the best interests of the child, and created a significant change in circumstances that could well affect the welfare of the child. Consequently, the chancellor granted appellee's request and awarded her temporary custody of the child, pending any further hearings on the issues of custody or visitation.

## I

Appellant's first contention is that the chancellor erred in awarding custody to appellee because he failed to find a change in circumstances sufficient to justify a transfer of custody. Specifically, he argues that since there was no evidence presented to indicate that his conduct adversely affected the welfare of the child, there was no justification for the chancellor's ruling.[2] We disagree.

---

**2.** Appellant does not contest the jurisdiction of the court in modifying its previous custody order. The court retained jurisdiction by virtue of Md.Code (1984), Fam.Law Art. § 9–204(a)(1)(ii).

The guiding principle of any child custody decision, whether it be an original award of custody or a modification thereof, is the protection of the welfare and best interests of the child. *Queen v. Queen*, 308 Md. 574, 587, 521 A.2d 320 (1987); *Ross v. Hoffman*, 280 Md. 172, 175, 372 A.2d 582 (1977); *Skeens v. Paterno*, 60 Md.App. 48, 61, 480 A.2d 820, *cert. denied*, 301 Md. 639, 484 A.2d 274 (1984); *Vernon v. Vernon*, 30 Md.App. 564, 566, 354 A.2d 222 (1976). This principle is not considered merely as one of many factors, "but as the objective to which virtually all other factors speak." *Taylor v. Taylor*, 306 Md. 290, 303, 508 A.2d 964 (1986). The reason for the court's concern with the best interests of the child is obvious and was explained eloquently by Judge Orth in *Ross v. Hoffman, supra:*

> In such disputes it is always the child who is not only the innocent victim, but who has the most at stake. Caught in the wake of marital discord, or adult indiscretion, or economic adversity, the well-being of the child, both present and future, is usually profoundly affected by the court's resolution of the private dispute over who shall be entrusted with its care. In more primitive societies where the large kinship group is the basic societal unit, child custody problems are solved by leaving the child with the dominant clan. In our society today, however, the social mores do not provide an automatic answer to custody questions. *See Comment*, 73 Yale L.J. 151 (1963).

280 Md. at 173–74, 372 A.2d 582.

Indeed, such custody questions routinely require courts to exercise the wisdom of Solomon[3] and render the most difficult of decisions. Recognizing this fact, Chief Judge Gilbert observed, in *Montgomery County v. Sanders*, 38 Md.App. 406, 381 A.2d 1154 (1978),

> Unfortunately, there is no litmus paper test that provides a quick and relatively easy answer to custody matters. Present methods for determining a child's best

---

**3.** 1 *Kings* 3:16.

interest are time-consuming, involve a multitude of intangible factors that ofttimes are ambiguous. The best interest standard is an amorphous notion, varying with each individual case, and resulting in its being open to attack as little more than judicial prognostication. The fact finder is called upon to evaluate the child's life chances in each of the homes competing for custody and then to predict with whom the child will be better off in the future. At the bottom line, what is in the child's best interest equals the fact finder's best guess.

38 Md.App. at 419, 381 A.2d 1154.

■ Several criteria must be considered in arriving at that "best guess," including, *inter alia*, the fitness of the parents, character and reputation of the parties, desire of the natural parents and agreement between the parties, potentiality of maintaining natural family relations, preference of the child, material opportunities affecting the future life of the child, age, health and sex of the child, residences of the parents and opportunity for visitation, length of separation from the natural parents, and prior voluntary abandonment or surrender. In reviewing those factors, Chief Judge Gilbert concluded that "while the court considers all the above factors, it will generally not weigh any one to the exclusion of all others." *Id.* at 420, 381 A.2d 1154 (citations omitted).

■ In the case *sub judice*, we are confronted with a modification of a custody award that transfers custody of the child from the "custodial" parent to the "visitor" parent. The burden in such cases is clearly on the party "who affirmatively seeks action by the chancellor in changing the custody of the minor child, to show why the court should take that action, and, if he fails to meet that burden, the action should not be taken." *Jordan v. Jordan,* 50 Md.App. 437, 443, 439 A.2d 26 *cert. denied,* 293 Md. 332 (1982). *See also Johnson v. Dominques,* 82 Md.App. 128, 134, 570 A.2d 369 *cert. granted,* 319 Md. 303, 572 A.2d 182 (1990); *Levitt v. Levitt,* 79 Md.App. 394, 398, 556 A.2d 1162, *cert. denied,*

316 Md. 549, 560 A.2d 1118 (1989). To warrant a modification of custody, a party must establish that the modification is necessary to safeguard the welfare of the child. In *Sartoph v. Sartoph,* 31 Md.App. 58, 354 A.2d 467, *cert. denied,* 278 Md. 732 (1976), we explained,

> The custody of children should not be disturbed unless there is some strong reason affecting the welfare of the child. To justify a change in custody, a change in conditions must have occurred which affects the welfare of the child and not of the parents. The reason for this rule is that the stability provided by the continuation of a successful relationship with a parent who has been in day to day contact with a child generally far outweighs any alleged advantage which might accrue to the child as a result of a custodial change. In short, when all goes well with the children, stability, not change, is in their best interests. [Footnotes omitted.]

31 Md.App. at 66–67, 354 A.2d 467. *See also Johnson v. Dominques, supra,* 82 Md.App. at 133, 570 A.2d 369; *Levitt v. Levitt, supra,* 79 Md.App. at 397–98, 556 A.2d 1162.

■ When a chancellor finds that the moving party has satisfied this heavy burden and established a significant justification for a change in custody, those findings must be accorded great deference on appeal, and will only be disturbed if they are plainly arbitrary or clearly erroneous. *Scott v. Dept. of Social Services,* 76 Md.App. 357, 382–83, 545 A.2d 81, *cert. denied,* 314 Md. 193, 550 A.2d 381 (1988); *Kennedy v. Kennedy,* 55 Md.App. 299, 310, 462 A.2d 1208 (1983). This deferential standard of review has long been applied in child custody cases. *Davis v. Davis,* 280 Md. 119, 125, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977); *Ross v. Hoffman, supra,* 280 Md. at 186, 372 A.2d 582; *Montgomery County v. Sanders, supra,* 38 Md.App. at 418–19, 381 A.2d 1154.

■ Appellant contends that the absence of any evidence establishing that his conduct has had an adverse impact on the welfare of the child renders the chancellor's decision a

clear abuse of discretion. Relying upon *Johnson v. Dom-inques, supra,* and *Jordan v. Jordan, supra,* he asserts that the mere fact of his relocation is insufficient to justify a change of custody. In *Johnson,* the parties retained joint custody of their children, although the children resided with their mother. The mother subsequently remarried and moved to Texas, at which time the master recommended that sole custody of the children be vested in the father. We reversed the change of custody on the ground that nothing in the chancellor's findings regarding the mother's conduct or the practicality of continued joint custody "constituted a change in circumstances *which affected the welfare of the children."* 82 Md.App. at 134, 570 A.2d 369. Earlier, in *Jordan,* we held that the custodial parent's remarriage and relocation to South Africa was insufficient, standing alone, to justify a change in custody. Further, in *In re Jessica M.,* 72 Md.App. 7, 14, 527 A.2d 766 (1987), *aff'd,* 312 Md. 93, 538 A.2d 305 (1988), we stated:

> Cases involving disputes between natural parents recognize that a custodial parent may take a child out of the country notwithstanding resulting restrictions to the noncustodial parent's visitation rights, *when the move is in the child's best interests. See, e.g., Andrews v. Andrews,* 242 Md. 143, 218 A.2d 194 (1966); *Jordan v. Jordan,* 50 Md.App. 437, 439 A.2d 26 (1982); *Sullivan v. Auslaender,* 12 Md.App. 1, 276 A.2d 698 (1971).

In all of the cases upon which appellant relies, however, the relocation of the custodial parent merely rendered the exercise of visitation rights more difficult. The whereabouts of the child or children were known and visitation was not prevented. By contrast, appellant's conduct in the case *sub judice* has effectively terminated appellee's right to visit her child, and clearly supports the court's finding that appellant is not a proper party to have custody of the child under these circumstances. *See Mitchell v. Mitchell,* 61 Md.App. 535, 543–44, 487 A.2d 680 (1985).

The testimony of appellee at the 16 April 1990 hearing indicated that appellant had taken the child from Michigan

and established residence in Canada. Appellee testified that appellant is a Canadian citizen and has many relatives living in Canada. Further, she stated that the principal of the school that the child had been attending in Michigan confirmed the child's unexplained absence since 16 February 1990 and informed her that the school had received a letter from appellant that was postmarked Quebec, Canada, although the principal would not disclose its contents. Additionally, Dr. Charles Goshen testified that, having treated appellee, he knew of no reason why she should not be considered by the court for custody of her child.

On the basis of the foregoing, the chancellor issued his 8 May 1990 order, in which he concluded,

> [Appellee] cannot produce the child to help establish existing factors which may be adversely affecting the child. The evidence introduced by her would tend to establish that [appellant], by moving twice within brief periods, has nullified the presumed advantages of continuity and stability. Likewise, by being in contempt of court and failing to appear and to produce the child, [appellant] has prevented the court from effectively continuing its jurisdiction to insure that the best interests of the child are being protected. [Appellant] appears to have created a significant change of circumstances which may well affect the welfare of the child. The court is being prevented from fulfilling its responsibility to make that determination at the request of a parent by the actions of [appellant].

Significant to the court's ruling, and to our decision to affirm that ruling, is the realization that Judge Fischer, in the divorce decree of 27 October 1988, determined that the best interests of the child would be safeguarded by awarding custody to appellant *and* rights of visitation to appellee. There was no suggestion that visitation had proved to be or threatened to be harmful to the child. Appellant's decision to relocate surreptitiously and deny appellee her "important natural and legal right" of visitation, (*see Shapiro v. Shapiro,* 54 Md.App. 477, 482, 458 A.2d 1257, *cert. denied,* 296

Md. 655 (1983)), could be deemed to be directly contrary to the best interests of the child and thus a sufficient basis for the chancellor's finding of a change in circumstances affecting the welfare of the child. Therefore, the chancellor's decision to award custody to appellee *pendente lite* was entirely proper.

## II

Appellant also contends that the chancellor erred in admitting hearsay evidence. Specifically, he argues that the chancellor should not have permitted appellee to testify concerning the substance of her phone conversations with the principal of the child's school in Michigan, with the National Center for Missing and Exploited Children, and with appellant's brother, Dan Shunk. Appellant asserts that all of that testimony constitutes inadmissible hearsay and its admission mandates a reversal of the chancellor's order. We disagree.

> Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, *the statement being offered as an assertion to show the truth of the matters asserted therein,* and thus resting for its value upon the credibility of the out of court asserter. McCormick, *Law of Evidence,* § 246, p. 584 (2d ed. 1972).

*Cottman v. Cottman,* 56 Md.App. 413, 423, 468 A.2d 131 (1983) (emphasis added), quoting *Kuhl v. Aetna Casualty and Security,* 51 Md.App. 476, 486, 443 A.2d 996 (1982), *aff'd,* 296 Md. 446, 463 A.2d 822 (1983). *See also McCray v. State,* 84 Md.App. 513, 518, 581 A.2d 45 (1990). The general rule is that such evidence is admissible if introduced for the purpose of showing that a party relied on and acted upon the statement and not for the purpose of showing that the facts stated in the declaration are true. *Purvis v. State,* 27 Md.App. 713, 716, 343 A.2d 898 (1975).

In the case *sub judice,* appellee was permitted to testify, over appellant's objection, that Ms. Betty Church, Principal of the Ina J. Meade School in Melvindale, Michigan, informed her during a telephone conversation that the child,

Joanna, was no longer attending school. Appellee also stated that she had received from Ms. Church a letter verifying Joanna's attendance record. The fact of appellee's receipt of a letter from Ms. Church is, of course, not hearsay. Rather, appellant's concern is with appellee's testimony regarding the content of the record and the substance of the phone conversations, which, although objected to by appellant, was not disputed during cross-examination or by other evidence.

■   Within the context of appellee's testimony, the statements relating to her conversation with Ms. Church were admissible, not to prove the truth of Ms. Church's assertions that the child was no longer attending a particular school, but to explain appellee's state of mind and her motivation in seeking a modification of the custody order. Significant to our review of this issue is the fact that the proceedings were conducted before a court sitting without a jury and, therefore, the court's evidentiary rulings are entitled to considerable deference. Inasmuch as the testimony was relevant to matters other than the truth of the content of the extrajudicial statements, the chancellor's decision to allow the testimony does not constitute an abuse of discretion.

■   Likewise, appellee's testimony that she had contacted the National Center for Missing and Exploited Children and other national organizations was admissible, not to prove the truth of the information appellant received from those organizations, but to explain her course of conduct in attempting to locate the child, and the basis for her petition for custody. Consequently, admission of the testimony was not erroneous. *See Ali v. State,* 314 Md. 295, 304, 550 A.2d 925 (1988); *Ezenwa v. State,* 82 Md.App. 489, 514, 572 A.2d 1101 (1990).

■   There is even less merit in appellant's contention that appellee's testimony regarding her telephone conversations with Dan Shunk, appellant's brother, was inadmissible hearsay. Appellee testified that Dan Shunk would, on

occasion, answer the phone and inform her that the child did not want to speak with her. Further, she stated that on one occasion she heard the child's voice say, "I do not wanna talk to you," and that the quality of the voice suggested to her that it was a recorded message. Appellee obviously did not offer the testimony to prove the truth of what she was told. On the contrary, she would certainly want the court to conclude that the message was false and that appellant and his brother were attempting to deceive her.

█ Relying upon *Mutyambizi v. State*, 33 Md.App. 55, 363 A.2d 511 (1976), *cert. denied*, 279 Md. 684 (1977), appellant contends that before testimony regarding telephone conversations may be admitted, preliminary testimony must be presented to establish the identity of the other person to the conversation. He argues that since no such preliminary testimony was presented in the case *sub judice*, appellee's testimony should have been excluded. Appellant's reliance on *Mutyambizi*, however, is misplaced.

In *Mutyambizi*, we observed that the mere fact that a caller purported to be the appellant was not sufficient to render the telephone conversation admissible. 33 Md.App. at 61–62. Nevertheless, we found no error in the court's admission of the evidence, since other testimony had been presented that indicated that the caller was indeed the appellant.

In the case *sub judice*, we are not confronted with a situation in which a witness received a telephone call from a third party and was permitted to testify regarding the substance of the conversation. The identity of the caller, appellee, is not disputed. Rather, appellant argues that no evidence was offered to establish the identity of the parties who were contacted by appellee. Such evidence, however, was in fact offered by appellee; specifically, she testified that she called the child's school and spoke with the principal regarding the child's attendance record and that she called the National Center for Missing and Exploited Children and discussed the steps she could take to locate her

child. Based upon appellee's testimony, it is apparent that she contacted the principal and the national organization at the appropriate telephone numbers listed in the telephone directory and spoke with individuals who possessed a sufficient familiarity with the relevant details to authenticate their identity. Thus, a proper foundation was laid for the introduction of the telephone conversations. *See Knoedler v. State*, 69 Md.App. 764, 773–74, 519 A.2d 811 (1987).

### III

Appellant's final contention is that the chancellor erred in failing to allow him 15 days in which to respond to appellee's Petition for Modification of Custody and for Contempt, pursuant to Md.Rule 2–311(b). The petition filed on 6 April 1990 was based upon the same allegations that were in the motion filed a month earlier but seeking different relief. Since it was filed at the court's suggestion, made during the 22 March hearing, it came as no surprise to appellant's counsel. The chancellor scheduled a show cause hearing on the petition for 16 April 1990, so that it could be heard with the other motions that had been rescheduled from 22 March. No response to the petition was filed, but that was not because of lack of adequate time to prepare one. Appellant's counsel could have made no different response to that petition than he had made to the earlier motions containing the same factual allegations, since he had not been in contact with appellant for over two months.

Md.Rule 2–311(b) provides that a party shall file a response to a motion within 15 days after being served with the motion.[4] We need not, however, address appellant's argument that a court's failure to provide 15 days for the filing of a response constitutes an abuse of discretion, since appellant failed to preserve this issue for our review. At no

---

**4.** Md.Rule 1–204 permits the court to enlarge or shorten time for the doing of an act for which a time is specified by rule or order of court. That rule was not invoked in this case.

time during the 16 April 1990 hearing did appellant object to the chancellor's decision to conduct the hearing at that time, nor did he request a continuance for the purpose of preparing an appropriate response. Appellant will not be heard to complain on appeal that the chancellor erred in not granting relief which was never requested of him. Md.Rule 8–131(a). *See also Miner v. Novotny,* 304 Md. 164, 168 n. 2, 498 A.2d 269 (1985); *Zellinger v. CRC Development Corp.,* 281 Md. 614, 620, 380 A.2d 1064 (1977).

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.