658 A.2d 1155

Dana S. (O'Neill) CORRY

v.

Robert J. O'NEILL.

No. 1291, Sept. Term, 1994.

Court of Special Appeals of Maryland.

June 2, 1995.

Reconsideration Filed June 30, 1995.

Leon W. Berg (Gendler, Berg & Singleton, P.A., on the brief), Baltimore, for appellant.

Harvey S. Wasserman, Edgewater, for appellee.

Argued before BLOOM, WENNER and HOLLANDER, JJ.

BLOOM, Judge.

The 9 January 1979 divorce decree that terminated the marriage of appellant, Dana S. O'Neill (now Corry), and appellee, Robert J. O'Neill, granted appellant custody of the parties' two minor children and, with modifications, incorporated an agreement between the parties dated 29 July 1977, which, *inter alia,* contained provisions for appellee's contributions toward the support and future education of the children. Those provisions engendered disputes that resulted in bouts of post-divorce litigation and culminated in this appeal, in which appellant presents the following questions:

1. Did the lower court err in its determination that child support of $350 per month pursuant to the Order of 28 October 1988 terminated when appellee's son attained the age of 18?

2. Did the lower court err in its computation of arrearages in child support?

3. Did the lower court fail to exercise discretion or abuse discretion in not permitting the appellant to present additional evidence of appellee's financial circumstance?

4. Was the lower court clearly erroneous in concluding that there was no evidence pertaining to appellee's ability to contribute to his son's college expenses?

We perceive neither error of law nor abuse of discretion in the trial court's decision and order.

## FACTS

The two children born of the parties' marriage are Heath, born 20 May 1968, and Brandon, born 7 October 1973. The agreement between the parties, which was incorporated in the 9 January 1979 divorce decree issued by the Circuit Court for Howard County, provided that appellee would pay $100 per month in child support for each child until each child reached the age of twenty-one. It also provided that the parties would each pay for the college expenses of their children "in accordance with their financial means at the time."

Pursuant to a stipulation, the divorce decree ordered appellee to pay a greater sum as child support than the settlement agreement provided for; it ordered him to pay appellant $250 per month for the two children. The parties having stipulated that appellee had an accumulated arrearage of $2,500 in child support and $746 in other expenses, the divorce decree also required that, commencing 1 January 1979, appellee would pay appellant $100 per month toward satisfaction of the arrearage in addition to the $250 per month as child support until 1 October 1982, after which the entire sum of $350 per month would be considered child support.

In 1987 appellant, through the Office of the State's Attorney for Howard County, filed a petition to cite appellee for contempt, alleging that he had failed to pay child support. Appellee filed a motion to modify child support on the ground that Heath had become eighteen years of age in May 1986. To resolve the pending actions regarding child support, the parties filed a Stipulation and Agreement that the court incorporated in an order in October 1988. In the Stipulation and Agreement, appellee acknowledged an arrearage of $15,000 in child support pursuant to the divorce decree. Although appellant maintained that appellee owed her $21,245 in child support arrearages as of 1 June 1988, she agreed to accept the compromise amount of $15,000 if appellee paid that sum on or before 30 September 1989. Appellee's child support obligation to pay $350 per month continued.

In October 1992, appellant filed a Complaint to Enforce Decree and to Find Defendant in Contempt, alleging that appellee had failed to make child support payments in accordance with the October 1988 order, and she also sought reimbursement for more than $25,000 in college expenses that she had paid on behalf of their son Brandon. Appellant contended that the child support payments of $350 per month were to continue until each child reached the age of twenty-one.

On or about 30 April 1993, appellant filed a request for production of certain documents, income tax returns, business records, bank records, and other documents reflecting appellee's financial status. Appellee failed to respond, so on 30 June 1993, just twenty days prior to the scheduled hearing before the master, appellant filed a motion to compel discovery. For some unexplained reason (certainly not attributable to appellant), there was a delay in presenting that motion to a judge; consequently, it was not until 9 August 1993, after a hearing on the merits had already been conducted before a master, that the motion was granted. Nevertheless, upon receipt of a copy of the motion to compel discovery, appellee's counsel faxed to appellant's counsel, less than one week before the scheduled hearing on the merits, copies of the following documents:

1. Appellee's income tax returns for 1990 and 1991. (Appellant asserted that there were no schedules attached to those returns.)
2. Appellee's 1099 statement for 1992 (he had not yet filed his income tax return for that year).
3. Financial statements of appellee's business for 1990, 1991, and 1992.
4. Titles to appellee's automobiles and deeds to his real property.
5. Bank statements from February 1992 through January 1993.

The hearing before Master Schwessinger was held on 20 July 1993. With respect to her claim for reimbursement of

college expenses, appellant testified about her income and financial ability, but failed to present any testimony or evidence regarding appellee's financial ability. She later filed a Motion for Leave to Reopen Testimony, but the master did not rule on this motion. The master issued a Report and Recommendations on 20 December 1993, and on 5 January 1994 the court ruled that appellant's motion to reopen the hearing to permit additional testimony was moot. Appellant filed exceptions to the master's report, and a hearing thereon was conducted by Judge Raymond J. Kane, Jr. Judge Kane eventually sustained in part and overruled in part the master's report and recommendations.

## A. CHILD SUPPORT DURATION

Appellant contends that the trial court erred by finding that appellee's obligation to pay child support in the amount of $350 per month pursuant to the October 1988 order terminated when the youngest child reached the age of eighteen. At oral argument, appellee conceded that, because the divorce decree incorporated the terms of the settlement agreement, he was required to pay child support until each child reached the age of twenty-one. *Kemp v. Kemp*, 287 Md. 165, 175, 411 A.2d 1028 (1980) ("Once the court decides to incorporate an agreement between the parties as part of its decretal relief ... the agreement is included within the order and is enforceable as a valid provision of the decree.") (citations omitted). He contends, however, that after both children attained the age of eighteen he was only required to pay the $100 per month per child agreed upon in the settlement agreement, and not the $350 per month required by the divorce decree.

In Maryland, prior to 1973, the age of majority was twenty-one years. By the enactment of Chapter 651 of the Laws of 1973, however, the General Assembly of Maryland lowered the age of majority to eighteen. That statute, now codified in Md.Code (1957, 1994 Repl.Vol.), Art. 1, § 24, provides:

(a) Except as otherwise specifically provided by statute, a person eighteen years of age or more is an adult for all

purposes whatsoever and has the same legal capacity, rights, powers, privileges, duties, liabilities, and responsibilities as prior to July 1, 1973, persons had at twenty-one years of age, and the age of majority is hereby declared to be eighteen years.

(b)(1) The terms "adult", "of full age", or "of legal age" refer to persons who have attained the age of eighteen years.

(2) The term "minor", as it pertains to legal age and capacity, refers to persons who have not attained the age of eighteen years.

Support agreements or decrees dated prior to 1 July 1973 were not affected by that statute. *Luhmann v. Luhmann*, 37 Md.App. 185, 189, 376 A.2d 1141 (1977). Specifically, we have held that references in such agreements or decrees for child support, dated prior to 1 July 1973, to "child," "children," or to a child of the parties by name, without further elaboration, and in the absence of a clear expression of contrary intent, will be taken as meaning support for a child of the parties until that child attains the age of twenty-one. *See Miller v. Miller*, 70 Md.App. 1, 18–19, 519 A.2d 1298 (1987); *Kramer v. Kramer*, 26 Md.App. 620, 631, 339 A.2d 328 (1975). *See also Monticello v. Monticello*, 271 Md. 168, 173–74, 315 A.2d 520 *cert. denied*, 419 U.S. 880, 95 S.Ct. 145, 42 L.Ed.2d 121 (1974) (regarding words such as "infant child," "minor child," "during infancy," "during minority," "until attaining majority," or "until age of majority" as used in agreements or decrees for support dated prior to 1 July 1973).

■ A court can require a parent to support a healthy child only until the child reaches majority. *Quarles v. Quarles*, 62 Md.App. 394, 403, 489 A.2d 559 (1985). The parents can, however, contractually obligate themselves to support a child for a longer period, and a court can enforce such an obligation if the parties consent to have the agreement incorporated or merged into the judgment of divorce. Md.Code (1974, 1991 Repl.Vol.), § 8–105(a)(2) of the Family Law Article; *Stancill*

*v. Stancill,* 41 Md.App. 335, 339, 397 A.2d 218, *aff'd,* 286 Md. 530, 408 A.2d 1030 (1979).

In the case *sub judice,* the settlement agreement that the court incorporated by reference into the divorce decree provided that appellee would

> pay unto the Wife for the support and maintenance of each of the two minor children of the parties . . . the sum of One Hundred Dollars ($100.00) per month per child, or a total of Two Hundred Dollars ($200.00) per month for all two of said children. Said payments with respect to each child shall cease and terminate upon the first to occur of any of the following events as to any such child: (a) arrival at age 21; (b) marriage; (c) becoming self-supporting; and (d) death of said child.

Despite the parties' agreement, which calls for appellee to pay $100 per month for the support of each of the two children, the divorce decree ordered appellee to pay $250 per month, later increased to $350 per month, as child support. Unquestionably, the court had the authority to modify the parties' agreement "in respect to [the] infants as to the court may seem proper, looking always to the best interests of such infants." Md.Code (1957, 1973 Repl.Vol.) Art. 16, § 28. Md. Code (1984, 1991 Repl.Vol.), § 8–103(a) of the Family Law Article, the successor to Art. 16, § 28, expresses the power to modify a settlement agreement in a slightly different manner, without any material alteration of substance: "The court may modify any provision of a deed, agreement, or settlement with respect to the care, custody, education, or support of a minor child of the spouses, if the modification would be in the best interests of the child." There has never been any dispute, therefore, as to the power of the circuit court to modify the agreement as to the *amount* of child support. Indeed, appellant agreed to such a modification. The issue in this case is whether the modification of the parties' agreement as to the amount of child support continues in effect beyond the child's minority. Appellee contends that the judicial modification of the parties' agreement, increasing appellee's child support

obligation, ceased to be in effect when Brandon attained the age of eighteen, and that thereafter appellee's obligation for child support reverted to the contractually fixed amount of $100 per month.

We believe that that contention, as novel as it may seem at first glance, is correct. We find that the statutory references to "infants" and "the best interests of such infants" in the statute in effect at the time of the settlement agreement and the divorce decree and to the "minor child" and the "best interests of the child" in the current statute to be significant. They constitute an acknowledgment that the court's jurisdiction over the support of a child and the protection of the child's best interests extends only during the child's minority. The court may, of course, enforce an agreement to support a child after the child attains his or her majority and, by incorporating the agreement into a decree, enforce the obligation either as a contractual one or as one imposed by a judgment. See Luhmann, 37 Md.App. at 189–90, 376 A.2d 1141. But in the absence of an agreement, a parent could not be forced to support a healthy adult child.

Although not directly on point, we regard the opinion of the Court of Appeals in Brodsky v. Brodsky, 319 Md. 92, 570 A.2d 1235 (1990), as instructive. The Court held therein that, after the daughter of the parties attained her majority, the circuit court had no authority to modify the support provisions of the divorce decree, which had incorporated the parties' separation agreement containing provisions for support for their daughter's college education. Quoting the language of § 8–103(a) of the Family Law Article concerning the authority of the court to modify an agreement with respect to the support of a minor child of the parties if that would be in the best interests of the child, the Court of Appeals pointed out that the daughter was no longer a minor when the request for modification was made. Id. at 100, 570 A.2d 1235. For the same reason that a court has no authority to modify a decree incorporating an agreement for support after the child ceases to be a minor, a court having exercised its authority to modify an agreement

for support of a minor child has no authority to extend that modification beyond the child's minority.

The circuit court appears to have recognized that limitation on its authority when the parties were before it in October 1988, when appellant, complaining that appellee was in arrears in payment of child support (she claimed that the arrearages amounted to $21,245.06; he admitted that he owed $15,000; and she agreed to accept that sum on condition that it be paid by 30 September 1989), sought to have appellee cited and punished for contempt. By agreement of the parties, appellee was ordered, *inter alia,* to continue to pay to appellant "the sum of Three Hundred and Fifty Dollars ($350.00) per month as and for the support and maintenance of Brandon R. O'Neill, the sole remaining minor child of the parties."

When the current round of litigation, which commenced with another petition to cite appellee for contempt, reached the hearing stage before a master, the master concluded that the October 1988 order to pay appellee $350 per month for the support of Brandon, "the sole remaining minor child of the parties," terminated when Brandon ceased to be a "minor child," that is, on 7 October 1991, his eighteenth birthday. Judge Kane agreed with the master, and, for the reasons stated above, we agree with both of them.

## B. COMPUTATION OF ARREARAGES

Appellant contends that the master incorrectly determined the number of months of child support arrearages that appellee owed appellant arising from the 1988 Stipulation and Order. The Master determined that appellee owed thirty-six months of back support payments accrued between November 1988 and October 1991 at a rate of $350 per month equalling $12,600. Appellant argues that appellee owed thirty-nine months of back support payments from August 1988 through October 1991 for a total of $13,650. At the hearing, Mr. Muller, from the Support Division of the Howard County Department of Social Services, testified that appellee owed thirty-nine months of support payments, but Mr. Muller could

not explain how he arrived at that figure. Consequently, the Master calculated the arrearage from the month after the Order was entered, November 1988, through October 1991, a period of thirty-six months.

██  The Stipulation and Order issued in late October 1988 was a compromise between the parties that dismissed appellant's Petition to Cite for Contempt and appellee's Petition to Modify Child Support.[1]  In the Stipulation, appellee agreed "to continue to pay unto the Plaintiff, Dana O'Neill, the sum of Three Hundred Fifty Dollars ($350.00), as ordered aforesaid." Neither the Stipulation nor the Order indicates that the child support payments provided for therein would be retroactive. Appellee argues that, because the Stipulation and Order were a compromise between the parties, payments were to begin in November 1988, the first month after the Order was issued. Appellant maintains that payments were to begin in August 1988 because the Stipulation acknowledges that appellee had an arrearage of $15,000 as of 5 July 1988. She suggests that in the Stipulation the parties calculated the arrearages owed up through July 1988, and the 1988 Order and Stipulation were to be retroactive to August 1988.

We are not persuaded that the conclusion of the master and the holding of the court, that the payments were not retroactive but were to begin upon the issuance of the order, were clearly erroneous; they are a reasonable interpretation of the evidence and testimony presented. Therefore we affirm the ruling of the circuit court that appellee owes arrearages for thirty-six months beginning on November 1988 through October 1991.

## C.  COLLEGE EXPENSES

Regarding college expenses, the settlement agreement between the parties provided:

---

1.  The parties' oldest son, Heath, turned 18 in May 1986. Therefore, appellee petitioned to decrease the amount of support he was required to pay.

The Husband and Wife agree that each will pay, in accordance with their financial means at that time, for the attendance of the children at a four-year college, university or technical or vocational school, to include registration fees and tuition, necessary books, room and board and laboratory fees.

## 1. Additional Evidence

■ Appellant contends that the circuit court erred in dismissing, as moot, her motion to reopen the case. That motion, however, was directed to the master and sought a hearing by the master before he submitted his report and recommendations. By the time the motion was put into the court file and reached Judge Kane, the master had already submitted his report and recommendations. Since the motion sought an opportunity to present more evidence to the master, it had unquestionably been rendered moot by the master's report. As Judge Kane pointed out, it would have been counterproductive to remand the case to the master to receive evidence that could just as well be heard by Judge Kane if he deemed it appropriate to accept more evidence. As it turned out, he chose to decide the case on the evidence presented to the master, concluding that appellant had shown no compelling reason to permit her to present evidence that she should have presented to the master.

■ That brings us to appellant's principal contention, that the trial court abused its discretion or failed to exercise discretion by not allowing appellant to present additional evidence regarding appellee's financial ability to pay for their son's college expenses. Specifically, appellant protests the court's denial of her request to take additional evidence, which was included in her Exceptions to the Master's Report and Recommendations. "Whether a case shall be reopened for the taking of additional testimony rests within the sound discretion of the trial judge; and from his grant or refusal to grant the request to reopen, ordinarily no appeal will lie." *Willey v. Glass*, 242 Md. 156, 163, 218 A.2d 212 (1966) (citations omitted).

Appellee was present at the master's hearing and available to be called as a witness, but appellant declined to call him. At the hearing, appellant had in her possession appellee's 1990 and 1991 income tax returns, as well as other financial documents reflecting appellee's financial status, but declined to submit them as evidence. Although she had received these documents only a few days before the hearing, appellant did not complain that she had had inadequate time to review them. Nor did she complain that the furnished documents were lacking in any material respect or inadequately reflected appellee's financial status.

In her exceptions to the master's report, appellant mentioned for the first time that the 1990 and 1991 income tax returns furnished by appellant did not have "the appropriate schedules attached." She did not indicate what schedules she was referring to or why their absence was significant. She asserted that appellant had not provided his 1992 tax return because he had received an extension and had not yet filed a return for that year. She complained that he should have filed one by that time. During the hearing on exceptions, appellant's counsel's primary complaint about the tax returns was that the copies furnished her were unsigned. At the hearing on her exceptions, she complained, for the first time, that she had received the requested documents six and four days prior to the hearing. She did not contend that the furnished material was too complicated to comprehend within such a short period; her complaint was that there was not enough time to find out if the unsigned tax returns "in fact were his tax returns" and the unsigned 1099 statement "was in fact what it was."

From the argument presented at the exceptions hearing, it is apparent that appellant had opted not to call appellee as an adverse witness or to present any evidence as to his financial status based on the documents furnished by him because she believed "that the burden is on the Defendant to present the evidence of his financial state, financial situation." Obviously, the issue of appellee's financial status was critical to appellant's claim, since appellant's contractual obligation to contrib-

ute to his children's college expenses was conditioned on his financial means at the time such expenses were to be incurred. We have stated that in breach of contract cases, such as this one, in which appellant is attempting to enforce a provisions of the settlement agreement, the burden of proof is on the plaintiff or on the party who asserts the affirmative of an issue, and such a burden never shifts. *Kruvant v. Dickerman,* 18 Md.App. 1, 3, 305 A.2d 227 (1973); *see also Noffsinger v. Noffsinger,* 95 Md.App. 265, 281, 620 A.2d 415 (1993). Appellee argued, the master concluded, and Judge Kane agreed that it was appellant's obligation to show that appellee had breached his agreement to contribute to his son's college expenses, and that meant that appellant was required to prove that appellee had the financial means to pay at least some of those expenses. Instead of meeting that burden, she chose only to show that she did not have the means to pay Brandon's college expenses so she borrowed money from her father to send her son to college.

We are not called upon to decide whether the master, in the first instance, and the chancellor, ultimately, erred with respect to the allocation of the burden of proof or burden of going forward with the evidence. That issue was not raised below and, more important, was not raised on appeal. In her exceptions to the master's report and recommendations, appellant did not assert that the master was wrong in concluding that she had the burden of presenting evidence as to appellee's financial means. The failure to set forth such a contention in the exceptions constituted a waiver of that issue. Md.Rule 2–541(h)(2). Consequently, the issue was not before Judge Kane, so he could hardly have committed an error of law with respect thereto. Even if the issue had been raised below, it is certainly not before us. In her appeal to this Court, appellant has made no contention that Judge Kane erred in allocating to her the burden of proof or burden of going forward with evidence to show that appellee had means—income or property—with which he could have paid all, or at least some, of their son's college expenses. Instead, she asserted that she did present a *prima facie* case that

appellee could have paid Brandon's college expenses and, in fact, paid tuition for one semester while agreeing to pay (and thereby acknowledging an ability to pay) "the entire bill." Her argument in this Court was that, by presenting a *prima facie* case, she had shifted the burden to appellee to prove that he could not afford to pay. We shall address that contention, together with a related one, anon.

The status of the case before Judge Kane with respect to appellant's breach of contract case, therefore, was as follows:

(a) Appellant had received, prior to the hearing before the master, documentary evidence reflecting appellee's income and assets (real estate, motor vehicles, and bank accounts). She had not contended that the material was received too late to be useful at the trial; and her complaints that the tax returns were unsigned and did not contain certain unspecified schedules did not establish that the documents furnished to her could not have been used to present at least a *prima facie* case that appellee had the means to contribute to Brandon's college expenses.

(b) Having an opportunity to present evidence in support of her claim, appellant chose not to present any evidence as to appellee's financial status because she believed (mistakenly) that it was up to appellee to present evidence proving that he could not pay for their son's college education. Appellant was not contending that the master was wrong as a matter of law in ruling that she had the burden of proof and in dismissing her claim because she had presented no evidence on the issue of appellee's ability to contribute to the boy's college expenses. Instead, what she was seeking was another evidentiary hearing, before either the master or the chancellor, to enable her to correct her tactical error by calling appellee as an adverse witness.

Judge Kane did not give appellant what appellee's counsel aptly termed "another bite at the apple." He decided the case on the basis of the record made before the master, thereby implicitly denying appellant's request of an evidentiary hear-

ing. That decision was one entirely within his discretion. Maryland Rule 2–541(i) provides that

exceptions shall be decided on the evidence presented to the master unless: (1) the excepting party sets forth with particularity the additional evidence to be offered and the reasons why the evidence was not offered before the master, and (2) the court determines that the additional evidence should be considered.

We are not persuaded that denial of appellant's request to reopen the case and provide another evidentiary hearing was an abuse of discretion. Appellant's tactical decision in declining to offer evidence that was available to her because she mistakenly believed that appellee had the burden of proving that he was not in breach of his contractual obligation is certainly not a compelling reason to reopen the case to let her present evidence that she had declined to present to the master.

## 2. Appellee's Financial Situation

■ Appellant claims that she presented before the master sufficient evidence to make out a *prima facie* case that appellee had the financial means to pay their son's college expenses. Therefore, she contends, Judge Kane erred in concluding that "the record before the Master is devoid of evidence pertaining to [appellee's] ability to contribute to the children's college expenses."

Appellant's argument is based upon her testimony before the master. In response to a question by her attorney, appellant said that appellee agreed to and did pay Brandon's tuition for his first semester at Penn State, but she added that appellant insisted that he had to take back from Brandon the Mazda RX7 sports car that he had earlier given his son and to sell the car in order to pay the tuition for that semester. Brandon turned the car back to his father to sell so he could go to school. Appellant testified that appellee told her that "he was going to be covering the whole bill and he needed the car back." It is appellant's contention that that snippet of evidence gave rise to an inference that appellant acknowl-

edged his financial ability "to cover the whole bill." Therefore, she argues, she made out a *prima facie* case that shifted to appellee the burden of going forward with the evidence.

It is perfectly clear from appellant's own testimony, however, that the conversation with appellee to which she referred concerned payment only of the bill for the son's first semester. Instead of making out a *prima facie* case of appellee's financial ability to pay Brandon's college expenses, her testimony tends to reflect a contrary state of affairs—whether true or not, appellee's position was that he would have to take back and sell the boy's car in order to pay one semester's tuition. That certainly does not amount to evidence that appellee thereafter had the means to pay Brandon's tuition for any succeeding semester, much less that he had the means to pay for the boy's room and board, books, or other expenses at Penn State.

Reviewing the testimony in context, Judge Kane correctly determined that the record of the proceedings before the master was, indeed, devoid of evidence pertaining to appellee's ability to contribute to his son's college education.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

HOLLANDER, Judge, dissenting.

For several overlapping reasons, I dissent from that portion of the panel majority's opinion concerning college expenses. First, the court erred because it failed to exercise its discretion concerning appellant's request to present additional evidence regarding appellee's financial circumstances. Second, even if the court did exercise its discretion, the court abused that discretion by denying appellant's request. Third, the trial court was clearly erroneous in its conclusion that the "record before the Master is devoid of evidence pertaining to [appellee's] ability to contribute to the children's college expenses." Fourth, the master and the circuit court improperly allocated the burdens of production or persuasion.

As the factual posture of the case is important to my analysis, I will review pertinent facts, some of which were not fully addressed by the panel majority.

*Factual Summary*

On July 20, 1993, the master conducted a hearing (the "July Hearing") with regard to appellant's Complaint. The Complaint had been filed in October 1992, but appellee was not served until late January 1993; he answered on February 11, 1993. By late April 1993, appellant filed a Request for Production of Documents. On June 30, 1993, when appellee's response was more than 30 days overdue, appellant filed a "Motion for Order to Compel Discovery." For reasons not attributable to appellant, the circuit court did not rule on the discovery motion until August 9, 1993. In its order, issued more than two weeks *after* the July Hearing, the court directed appellee to produce the requested discovery within 15 days.

After appellant filed her motion to compel, but before the court issued its discovery order, appellee had furnished some of the requested discovery. Appellee waited, however, until the eve of the July Hearing to do so. Thus, on July 14 and July 16—just days before the July Hearing—appellee produced some of his financial records.

At the July Hearing, appellant neither introduced records evidencing appellee's financial status nor called appellee as an adverse witness. She testified, however, that appellee paid for their son's first semester of college and that she personally talked to appellee about the cost of tuition. According to appellant, although she had spent a substantial sum of money on repairs for the son's car, appellee wanted the car because the tuition "was going to be expensive and ... *he was going to be covering this whole bill,* and he needed the car back." (Emphasis added).

After appellant rested, the master said to appellee: "I assume you have witnesses that you will be calling...."

Instead, appellee moved to dismiss,[2] arguing that appellant failed to establish appellee's financial ability to pay the college tuition. In response, appellant claimed that it was appellee who was obligated "to testify to his inability to pay ... this is a support obligation ... on Mr. O'Neill's part." The master decided to hold the matter *sub curia* and continued the case until September 28, 1993. Shortly before the scheduled hearing, however, the master cancelled it. Consequently, appellee never presented any evidence or controverted appellee's testimony.

Subsequently, in a written opposition to appellee's motion for judgment, appellant vigorously contended that appellee had the burden to establish his own financial condition. On November 1, 1993, while the matter was under advisement, appellant submitted to the master a "Motion for Leave to Reopen Testimony," in which she noted that appellee's "partial discovery ... was provided less than one week prior to the [July] hearing" and that appellee continued to provide "full discovery," notwithstanding the circuit court order of August 9, 1993. Appellant also explained that she had not called appellee as an adverse witness because of appellee's failure to comply with discovery, his knowledge of his own financial situation, and her view that it was appellee who had the burden to establish his financial circumstances. Without ever formally ruling on the motion, the master issued his report on December 20, 1993. Soon thereafter, the court denied the motion to reopen as moot.

Appellant timely noted exceptions to the master's report. She raised, *inter alia*, the discovery issue and asked the court either to remand to the master or, alternatively, to hear the additional evidence. At the hearing on the exceptions, held on April 12, 1994, appellant argued "that the burden is on the Defendant to present the evidence of his financial state, financial situation ... justice demands that the Defendant bear the burden of producing that evidence." She renewed

---

2. Appellee's motion was, in actuality, a motion for judgment.

her request to require appellee to produce evidence as to his financial condition or else to permit her to offer such evidence. To that end, counsel said that she had "issued a subpoena duces tecum for Mr. O'Neill to bring those [documents]" to the hearing.

### Discussion

### I.

The trial judge failed to exercise his discretion concerning appellant's request to present evidence with respect to appellee's financial circumstances. A review of the court's Memorandum and Order of April 15, 1994 reveals that the court never expressly addressed appellant's request either for remand or an opportunity to present the evidence to the chancellor. *Cf. Kirchner v. Caughey*, 326 Md. 567, 572, 606 A.2d 257 (1992) ("There is no discussion of the issues by the chancellor, and no indication that he applied his independent judgment.... We now make clear that the ... opinion of the chancellor should address ... the issues relating to the conclusions to be drawn from the facts found"). Nor can I conclude that the implicit rejection of appellant's request constituted the exercise of discretion. To the contrary, the trial court failed "to exercise choice in a situation calling for choice...." *Hart v. Miller*, 65 Md.App. 620, 627, 501 A.2d 872 (1985), *cert. denied*, 305 Md. 621, 505 A.2d 1342 (1986).

Pursuant to Md.Rule 2–541(i), which governs hearings on exceptions, if the court determined that presentation of additional evidence was warranted, the court could have remanded the matter to the master, it could have elected to hear the additional evidence, or it could have conducted a *de novo* hearing. *Best v. Best*, 93 Md.App. 644, 650, 613 A.2d 1043 (1992). Rule 2–541(i) states, in pertinent part:

The exceptions shall be decided on the evidence presented to the master unless: (1) the excepting party sets forth with particularity the additional evidence to be offered and the reasons why the evidence was not offered before the master, and (2) the court determines that the additional evidence

should be considered. If additional evidence is to be considered, *the court may remand the matter to the master to hear the additional evidence* and to make appropriate findings or conclusions, *or the court may hear and consider the additional evidence or conduct a de novo hearing.* (Emphasis added).

*See also* Md.Rule 2–514. (where justice requires, trial court may continue a hearing and order production of documents for inspection by the court or issue a subpoena to obtain a person's testimony).

Relying on *Domingues v. Johnson,* 323 Md. 486, 593 A.2d 1133 (1991), we recently reiterated in *Lemley v. Lemley,* 102 Md.App. 266, 277, 649 A.2d 1119 (1994) that "[w]hen a litigant files exceptions to the report and recommendations of a master, the chancellor must 'exercise independent judgment to determine the proper result'" (citation omitted). Further, "[d]iscretion is a 'reasoned decision based on the weighing of various alternatives.' When a court must exercise discretion, failure to do so is usually reversible error." *Lone v. Montgomery Co.,* 85 Md.App. 477, 485, 584 A.2d 142 (1991) (citations omitted). *See also Maus v. State,* 311 Md. 85, 108, 532 A.2d 1066 (1987) (same).

The court's failure to exercise its discretion is particularly troubling in view of its ultimate conclusion that appellant was not entitled to prevail because she failed to prove appellee's financial condition. Given the court's view that the record was "devoid" of crucial evidence, it was incumbent upon the court to address appellant's request and, inherent in that, the propriety of the master's implicit denial of her motion to reopen.[3]

To play fair, a trial judge relying upon discretionary powers should place on record the circumstances and factors that were crucial to his determination. He should spell out his reasons as well as he can so that counsel and the reviewing court will know and be in a position to evaluate the sound-

---

3. Obviously, had the trial court granted appellant's request to supplement the record, any deficiency in the record may have been cured.

ness of his decision. If the appellate court concludes that he considered inappropriate factors or that the range of his discretionary authority should be partially fenced by legal bounds, it will be in a position to do this intelligently.

M. Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L.Rev., 635, 665–666 (1971).

## II.

I do not lightly quarrel with a trial court's exercise of discretion. But here, if the court exercised its discretion, then I am constrained to find it was abused. Several considerations combine to compel that conclusion.

In exercising its discretion, the court apparently failed to consider a variety of factors, which may be summarized as follows: Appellee, belatedly and without any explanation, made an eleventh hour production of critical financial documents; the circuit court, *after* the July Hearing, issued a discovery order requiring appellee to furnish discovery and appellee did not comply; given the posture of the case, including the nature, in general, of proceedings before masters and that another hearing date had been scheduled, appellee would not have suffered any prejudice if the master had granted the motion to reopen; the consequences of dismissal were extreme, particularly since the son's college education at the school of his choice may have hung in the balance; appellee was in the best position to establish his own financial circumstances, particularly because of the discovery violation; appellant's counsel did not fail to offer evidence of appellee's economic status as a matter of trial strategy—she raised an important legal issue as to whether the burden fell to appellee to establish his financial resources; if appellant's counsel erred in her assessment of the burdens of persuasion or production, her client has been made to pay an enormous penalty; a dismissal on technical grounds runs counter to a "valid societal preference for a decision on the merits." *Hart v. Miller*, 65 Md.App. at 628, 501 A.2d 872.

I will explore some of these points in more detail.

## A.

In assessing whether the trial court abused its discretion, it is hard to ignore the circumstances surrounding appellee's discovery violation. This is so particularly because the master and the chancellor allocated to appellant the burdens of production and persuasion regarding appellee's financial resources, and then determined that she failed to meet those burdens. Assuming that appellant was obligated to shoulder those burdens, appellee's discovery violation was especially egregious.

When appellant appeared at the July Hearing, she indisputably had just received appellee's discovery, which was nonetheless incomplete. After the July Hearing, the trial court issued an order compelling discovery; that order effectively constituted a finding by the circuit court that appellee violated his discovery obligation. In resolving the merits of appellant's request to present additional evidence, that finding should have weighed heavily in appellant's favor.

The majority suggests that appellant essentially sat on her rights, despite appellee's delayed and incomplete discovery production, because she failed to protest to the master, declined to call appellee as an adverse witness, and chose not to make use of whatever documents she had obtained. But at the exceptions hearing, appellant explained that, because of appellee's discovery violation, she should not have been forced to call appellee as a witness to produce evidence in appellee's possession. This would have placed her "in the position of having to put on a witness as her witness without knowing what the truth of the matters were and not even being able to be in a position to ... appropriately cross examine ... him...." [4] I agree.

Production of discovery, on the eve of trial, results in "unfair surprise." *Bartholomee v. Casey,* 103 Md.App. 34, 48,

---

4. Counsel also noted that the "operative year" was 1992 and, presumably, by the time of the exceptions hearing, appellee would have his 1992 tax return, even though that return had not been produced for the July Hearing.

651 A.2d 908 (1994), citing John A. Lynch, Jr. & Richard W. Bourne, *Modern Maryland Civil Procedure* § 7.8(c), at 597 (1993). Appellant, through no fault of her own, was put in the position of having to proceed to trial without adequate time to review, prepare, or verify information that she had received. The majority's suggested solution—to call appellee as an adverse witness—was not, under the circumstances, a viable solution. That approach would have amounted to a fishing expedition in contravention of the purpose of discovery. Rather, as a remedy for the discovery violation, the court should have remanded to the master or taken additional evidence on its own. This would not have been a "second bite at the apple;" appellant never really had much in the way of a first bite.

The court's role in ruling on the discovery motion, after the July Hearing, is also significant. Because of the brief time between appellee's answer and the July Hearing, I recognize that it was unrealistic for the parties or the court to have proceeded more quickly in connection with the discovery dispute. Nevertheless, the trial court apparently failed to consider that appellant was ultimately penalized because the circuit court did not rule on appellant's discovery motion in advance of the July Hearing. Had a discovery order been entered before the July Hearing, a violation of the order would have entitled appellant to move for sanctions under Rule 2–433. As a sanction, the court could have deemed appellee's ability to pay as having been established (Rule 2–433(a)(1)) or it could have barred appellee from opposing a particular claim asserted by appellant. Rule 2–433(a)(2).[5]

---

5. Maryland law grants broad discretion to a trial court to fashion a remedy based on a party's failure to abide by the rules of discovery. *Bartholomee*, 103 Md.App. at 48, 651 A.2d 908. *See* Hon. Joseph F. Murphy, Jr., *Maryland Evidence Handbook*, § 504(C), at 235 (2nd ed. 1993); Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary*, Rule 2–422, at 302 (2nd ed. 1992); *State Roads Comm'n v. 370 Ltd. Partnership*, 325 Md. 96, 106–111, 599 A.2d 449 (1991); *Starfish Condo Ass'n v. Yorkridge Service Corp.*, 295 Md. 693, 458 A.2d 805 (1983); *Taliaferro v. State*, 295 Md. 376, 398, 456 A.2d 29, *cert. denied*, 461 U.S. 948, 103 S.Ct. 2114, 77 L.Ed.2d 1307 (1983); Md.Rule 2–

Further, once the circuit court ordered production *after* the July Hearing, the court should have permitted appellant to obtain the records embodied in the order and should have permitted her to use them in a subsequent proceeding. Doing otherwise rendered the court's August discovery order hollow.

### B.

As noted, the trial court found that the record before the master was "devoid of evidence." Thus, the court acknowledged that it did not have sufficient first-level facts upon which to resolve an important issue. Indeed, neither the chancellor nor the master ever resolved whether appellee had the ability to pay some portion of the tuition. Rather, they determined only that appellant did not prove the extent of appellee's ability to pay. What we said in *Levitt v. Levitt*, 79 Md.App. 394, 556 A.2d 1162, *cert. denied*, 316 Md. 549, 560 A.2d 1118 (1989), is apt here:

The Master's primary responsibility is to develop the first-level facts.

\* \* \* \* \* \*

It is these first-level facts found by the Master which form the base on which the Chancellor makes his or her judicial determination.... *If the Chancellor finds the Master's factual base inadequate, the Chancellor may remand to the Master or the Chancellor may conduct a de novo hearing, again so that a sound factual base exists for the ultimate determination.*

\* \* · \* \* \* \*

When, as here, a Chancellor is faced with a report that omits critical first-level facts, the Chancellor has only two courses to follow—to hear further evidence or remand to

---

433(a). Clearly, in this case, a remedy barring appellee's use of his own documents would not be a remedy at all. The sanction of document preclusion would have been injurious to appellee only if he sought to introduce the records; as appellee never sought to introduce his records, that remedy has no meaning in this case.

the Master to make the findings. This is basic to the relationship between Chancellor and Master—the two participants in the decision-making process.

*Id.* at 399, 402, 556 A.2d 1162 (emphasis added; footnote omitted).[6]

The court had statutory authority either to remand to the master, to receive additional evidence, or even to conduct a *de novo* review. Md.Rule 2–541(i). Whatever mechanism the court employed, the importance of an "adequate factual predicate for the ultimate disposition of the case" cannot be overstated. *Best,* 93 Md.App. at 654, 613 A.2d 1043. The trial court has broad authority, under Md.Rule 2–541(i) and the common law, "to conduct a *de novo* hearing in any case in which the chancellor is not satisfied that a proper decision can be rendered based on the proceedings before the master...." *Best,* 93 Md.App. at 653–654, 613 A.2d 1043. In this case, given the totality of the circumstances and the complete lack of information as to appellee's financial circumstances, the case cried out for the opportunity to present additional information as to appellee's financial condition.

## C.

In asserting that appellee had the burden of production or persuasion as to his financial circumstances, appellant raised a serious legal issue. *See* discussion, Part IV *infra.* Appellant certainly made clear that she opted not to offer evidence as to appellee's financial situation not, as the majority suggests, on the basis of misguided "strategy," but because she thought the burden to do so fell on appellee. Nevertheless, when confronted with a motion to dismiss, appellant sought to reopen. The court should have recognized that the master unreasonably refused to permit appellant to reopen, even though another evidentiary hearing had already been scheduled.

---

**6.** The chancellor, of course, must make the ultimate conclusions and judgments, based on his or her "independent review of the record and of the facts properly found by the master." *Domingues v. Johnson,* 323 Md. at 491, 593 A.2d 1133.

### D.

In the end, this case was reduced to a matter of gamesmanship instead of a search for the truth. This is especially so when one considers that, potentially, the son's opportunity for a college education was at stake. Indeed, the tuition unquestionably was for the benefit of the son, not appellant.

In sum, under all of the circumstances, the trial court's refusal to permit a remand to the master or to conduct additional evidentiary proceedings of his own amounted to an abuse of discretion.

> [T]he chancellor has the power—indeed the plain duty—to allow defects in proof to be supplied at any time, when, in his discretion, the ends of justice will be served; and that his action in so doing will only be reversed if it is arbitrary and the rights of some of the parties are improperly affected.

*Nusbaum v. Saffell,* 271 Md. 31, 40, 313 A.2d 837 (1974), citing *Bradford v. Eutaw Savings Bank,* 186 Md. 127, 46 A.2d 284 (1946).[7]

### III.

As has been noted, appellant introduced evidence concerning appellee's ability to pay; she testified that appellee paid one semester of college and said that he would pay the rest of the tuition. Appellant also said that appellee insisted on the return of the son's car to defray the tuition expense. Appellee never refuted appellant's testimony. Yet the court denied the exceptions because it said the record was devoid of evidence as to the husband's ability to contribute to the cost of tuition.

Although the evidence was, admittedly, scanty, the record certainly was not "devoid" of evidence. Therefore, the court's finding was clearly erroneous. This is especially so in the

---

7. There is, perhaps, one bright note for appellant; the majority's decision has no prospective effect. Thus, as to future years of the son's college education, it would seem that the parties may yet return to court to litigate their respective abilities to pay.

posture of a motion to dismiss, when the court is obligated to construe all inferences in the light most favorable to the party against whom the motion is made. Moreover, even if the motion were one for judgment, neither the master nor the court ever found that appellant's testimony was unworthy of belief.

## IV.

In my view, appellant did not bear the ultimate burden of persuasion in regard to appellee's financial condition. Nevertheless, even if appellant did have that burden, she produced sufficient evidence in her case as to appellee's financial ability, so that the burden of production shifted to appellee.

The majority asserts that appellant did not raise—and we need not consider—the issue of burden of proof. That conclusion is not supported by the panel majority's own words. The majority correctly states that appellant argued below that "the burden is on the defendant to present evidence of his financial state, financial situation." The majority also points out that "[a]ppellee argued, the master concluded, and Judge Kane agreed that it was appellant's obligation to show that appellee had breached his agreement to contribute to his son's college expenses, and that meant that appellant was required to prove that appellee had the financial means to pay . . . ." Finally, the panel majority determined that appellant did not meet her burden, because she did not demonstrate appellee's financial ability to pay some of the college tuition.

As the majority makes plain, the important issue of allocation of the burdens of persuasion and production permeated the proceedings below. On appeal, appellant specifically argues only that, based on the evidence adduced, the burden of production shifted to appellee. Nevertheless, the question of burdens of persuasion and production is subsumed in appellant's claim that the court erred "in concluding that there was no evidence pertaining to appellee's ability" to shoulder some of the college expense.

A.

But for their agreement, neither party would have had a legal obligation to pay for their son's college education, as the son was emancipated. The settlement agreement, however, is tantamount to an extension of the parents' mutual obligation of child support, at least with respect to college expenses. *See Kramer v. Kramer,* 26 Md.App. 620, 637–38, 339 A.2d 328 (1975) (parties can, by agreement, extend support obligation beyond emancipation, particularly with respect to college expenses). When viewed in this light, appellant's failure to present information concerning appellee's financial status was not grounds to dismiss her claim.

Each parent has an independent duty to support his or her child, which "derives from the obligation of the parent to the child, not from one parent to another." *Rand v. Rand,* 40 Md.App. 550, 554, 392 A.2d 1149 (1978); *see also Goldberger v. Goldberger,* 96 Md.App. 313, 324, 624 A.2d 1328, *cert. denied,* 332 Md. 453, 632 A.2d 150 (1993) (by nature and by law, the status of parenthood entails the duty of support). In fashioning a child support award, the court must consider the respective economic position of the parents. *Unkle v. Unkle,* 305 Md. 587, 597, 505 A.2d 849 (1986) (citing cases). *See also Bagley v. Bagley,* 98 Md.App. 18, 38–39, 632 A.2d 229 (1993), *cert. denied,* 334 Md. 18, 637 A.2d 1191 (1994) (child's ability to realize potential should not be diminished by divorce even though parents may incur greater expenses); Md.Code Ann., Fam.Law Art. § 12–202 (1991) (factors in awarding support). Depending on the parties' station in life, college expenses of a minor child may be a necessity towards which both parents must contribute to the extent they are able. *Campolattaro v. Campolattaro,* 66 Md.App. 68, 82–83, 502 A.2d 1068 (1986). Indeed, courts in other jurisdictions have required parents of children who have reached legal age to pay college expenses beyond their children's emancipation, even in the absence of an agreement to do so. *See, e.g., Newburgh v. Arrigo,* 88 N.J. 529, 443 A.2d 1031 (1982); *Spitzer v. Tucker,* 404 Pa.Super. 539, 591 A.2d 723 (1991); *see also* Annotation, *Responsibility of Noncustodial Divorced Parent to Pay For, or Contribute*

*To, Costs of Child's College Education,* 99 A.L.R.3d 322 (1980 & Supp.1991).

The case of *Rand v. Rand,* 280 Md. 508, 374 A.2d 900 (1977), *aff'g* 33 Md.App. 527, 365 A.2d 586 (1976) is pertinent here. In *Rand,* when the age of majority was still twenty-one, the parties had agreed at separation to send their child to college. As the time for college approached, the wife filed a motion to increase support payments. At that time, she was earning a net income of $300 per month after personal expenses, and the husband was earning a net income of $500 per month after personal expenses; college cost $520 per month. The chancellor decided to increase the husband's support payments to $480 per month, representing 92% of the total cost of college. Relying on the Equal Rights Amendment ("E.R.A."), codified at Article 46 of the Maryland Declaration of Rights, this Court rejected the wife's "contention that as the mother she is but contingently obligated to contribute to the support of her minor child...." 33 Md.App. at 539, 365 A.2d 586. Accordingly, we reversed, directing the lower court to set the support payment according to the proportion of the parents' disposable incomes.

The Court of Appeals agreed. Essentially, the Court held that, under the E.R.A., each parent has an equal duty to support; the liability of each parent does not depend on the financial *inability* of the other. 280 Md. at 511–12, 516, 374 A.2d 900. What the Court said then remains relevant now:

> We, therefore, fully agree with the Court of Special Appeals that the parents must share the responsibility for parental support in accordance with their respective financial resources. In so holding, we do not undertake to mandate any specific formula by which the chancellor is to calculate the amount of support to be charged against each parent. Whether it is appropriate to utilize a "net income after personal expenses" test, as the Court of Special Appeals did in this case, or a gross income, or a total capital resources test, or some other measure of assessing financial

resources, is a matter to be determined by the chancellor in view of the circumstances of each individual case.

*280 Md.* at 517, 374 A.2d 900.

The same rationale should apply here, even though the duty to provide support technically arises from the parties' separation agreement, rather than by operation of law. The portion of the separation agreement creating a duty to pay the child's college expenses is, functionally, an agreement to provide *support* through college. The agreement dictates that *both* parents would pay, to the extent they could; it does not place the primary duty of paying for college solely on one parent, and impose only contingent liability upon the other. Thus, if appellee wanted to avoid his duty to pay under the separation agreement, *he* had the burden of demonstrating his inability to do so. This conclusion is premised on the concern, as a policy matter, with the child's best interest, not the parent's financial comfort.

## B.

Even if, as the majority suggests, contract principles apply, I would analogize the proceedings to a suit for payment of a debt. Typically, in those cases, when a plaintiff sues, claiming a debt is due and owing, a borrower who has actually paid the debt must plead, *as an affirmative defense,* that the debt has been satisfied. *See* Md.Rule 2–323(g)(12). *See also McCormick on Evidence* § 337, at 429 (John W. Strong, et al., eds., Practitioner Treatise Ser., 4th ed. 1994) ("A doctrine often repeated by the courts is that where the facts with regard to an issue be peculiarly in the knowledge of a party, that party has the burden of proving the issue. Examples are the burdens commonly placed upon the defendant to prove payment. . . .") (hereinafter, *McCormick* ). In much the same way, appellee should have been required to establish his inability to pay, as an affirmative defense. He would then have been obligated to produce evidence as to his financial status and he would have had the burden of persuasion on that issue.

The case of *Lake v. Callis,* 202 Md. 581, 97 A.2d 316 (1953) (Sobeloff, J.) is instructive here. *Callis* concerned a dispute between a bankruptcy trustee on the one hand, and the bankrupt and his wife on the other, over a portion of the cash surrender value of certain insurance policies used as security for a mortgage loan. After a foreclosure, the mortgagee resorted to the cash surrender value of the bankrupt's life insurance to discharge the balance of its claim. As the value of the policies exceeded the deficiency, the trustee sought to recover the remaining portion of the fund. Appellees argued, however, that the fund was not an asset of the bankruptcy estate and that appellees were sureties, not debtors. They also claimed that the trustee had the burden to prove that appellees benefitted from the loan.

The bankruptcy trustee, in contrast, contended that appellees had the burden to prove their status, which they did not do; they never testified or produced evidence in support of their claim.[8] Since appellees did not establish that they did not receive the benefit of mortgage loans, the trustee asserted that they could not maintain their claim for subrogation. What the Court said is pertinent:

> The appellees themselves did not testify, although the issue concerned matters with which they were better acquainted than anyone else. They failed to show what happened to the proceeds of the mortgage loan. It is a rule grounded in common sense that the burden of proving a fact is on the party who presumably has peculiar means of knowledge enabling him to prove its falsity, if it is false.
>
> *       *       *       *       *       *
>
> [T]he facts upon which the appellees make their claim must be distinctly shown. Evidence is totally lacking to support a valid conclusion that the loan was not actually made to

---

8. In a comment particularly apt here, the Court observed:
   As both sides preferred to argue doubtful inferences from facts not proved though available, rather than to prove the facts, the record was left in a very incomplete state.
   *Id.* at 586, 97 A.2d 316.

[appellees].... The appellees failed to meet their burden of proving even a *prima facie* case entitling them to prevail. Their effort to be cloaked in a status contradictory to that unmistakably shown by their signatures must thereafter fail.

*Id.* at 587–89, 97 A.2d 316.

Similarly, appellee here failed to testify or produce a shred of documentary evidence to establish even a *prima facie* case of his inability to pay. He never controverted appellant's testimony that, at least inferentially, established appellee's ability to pay. Especially in light of appellee's discovery failure, he is the one with the "peculiar means of knowledge" of his own financial status. *See District Heights Apts. v. Noland Co. Inc.*, 202 Md. 43, 50, 95 A.2d 90 (1953) ("It is an accepted rule that where a plaintiff has established a *prima facie* case, and the defendant seeks to support his defense by facts which are or ought to be within his knowledge, the burden shifts to him."); *Plummer v. Waskey*, 34 Md.App. 470, 485, 368 A.2d 478, *cert denied*, 280 Md. 734 (1977) ("[T]he burden of ultimate persuasion as well as the burden of producing evidence may be allocated to either party on any particular issue as the emerging common law deems appropriate and fair.").

## C.

"It is well established that the broad concept of 'burden of proof' consists of at least two component parts: the burden of production (also referred to as the duty of going forward with the evidence) and the burden of persuasion." *Kassap v. Seitz*, 315 Md. 155, 161–62, 553 A.2d 714 (1989). Even if appellant had the burden of persuasion regarding appellee's ability to pay, based on the evidence adduced, she produced sufficient evidence to shift to appellee the burden of going forward. Appellee did not meet his burden.

Given appellant's testimony that appellee paid their son's first semester of college tuition and said he would cover the whole expense, appellant's testimony established, inferentially,

appellee's capacity to pay. As *McCormick* points out, "the initial allocation of the burden of producing evidence may not always be final. The shifting nature of that burden may cause both parties to have the burden with regard to the same issue at different points in the trial." *Id.* § 337, at 431 (footnote omitted). Appellant's testimony was enough to require appellee to produce evidence to the contrary.

Support for the view that appellee had the burden of production derives from the recent case of *Port East Transfer, Inc. v. Liberty Mut. Ins. Co.,* 330 Md. 376, 624 A.2d 520 (1993). There, in an action for additional premiums under a retrospective premium policy, the insurance company filed a complaint in federal court alleging breach of contract and money due on an account between the parties. The federal court certified a single issue to the Court of Appeals, regarding the allocation of burdens of persuasion and production.

The duty of good faith was viewed an implied element of the insurer's claim. Nevertheless, the insurer argued that it was not required to prove that it had acted reasonably and in good faith with respect to the hundreds of claims it settled for its insured. Rather, the insurer contended that it was sufficient to allege and prove the existence of the contract and a breach; the insured's claim of breach of an implied obligation to act reasonably and in good faith constituted an affirmative defense. Accordingly, the insured had the burden of going forward in order to generate the issue.

The Court recognized that the allocation of the burden of production is "simply a device for predetermining who shall have the burden of producing sufficient evidence to legitimately create an issue." *Id.* at 387, 624 A.2d 520. The Court said that "to require the insured, in the absence of any evidence of bad faith, to offer proof of its good faith in investigating, adjusting, and settling hundreds of claims in order to prove its action for premiums, 'would abuse both the parties and the judicial system.'" *Id.* at 386, 624 A.2d 520 (citation omitted). Consequently, the insurer only had to prove its good faith if the issue was generated. Moreover, the Court placed on the

insured the duty to come forward with a challenge. What the Court said is instructive here:

> [I]n a case such as this, although the ultimate burden of proof of its claim remains at all times with the insurer, the burden of production of evidence of violation by the insurer of an implied condition of good faith is upon the insured. We believe this allocation of the burden of production will provide adequate protection for the party claiming bad faith, but will not unnecessarily burden the insurer or the court with protracted proceedings and unnecessary production of evidence concerning matters not legitimately at issue.

*Id.* at 386, 624 A.2d 520.

While the insurer had greater knowledge of its own conduct, the information was, because of ample discovery tools, also available to the insured, who could then decide whether to mount a challenge. Given appellee's conduct during discovery, the Court's recognition of the important role of the discovery process is particularly noteworthy:

> In allocating to the insured this burden of coming forward with the evidence, we have taken into consideration that the insurer will ordinarily have superior knowledge of the facts bearing on the issue. Of necessity, then, *wide latitude must be given the insured in pretrial discovery.* It seems unlikely that an insured will undertake the considerable expense of an extended inquiry into every case file without some reasonable suspicion that the insurer failed in its implied obligation. If the insured wishes such an inspection, however, modern discovery techniques are entirely sufficient to permit it, *and the parties may thereby determine the existence of legitimate issues that should probably be brought before the court.*

*Id.* at 386–387, 624 A.2d 520; emphasis added.

If the insured in *Port East* had the duty to come forward to dispute the insurer's good faith, then appellee here had the duty to come forward with some evidence of his inability to pay. The Court's reasoning is all the more pertinent here because appellant did not fully have the benefit of "modern

discovery techniques;" the order compelling discovery post-dated the July Hearing, and appellant was not furnished with discovery in sufficient time to make genuine use of it.